In re CONSOLIDATED UNITED STATES ATMOSPHERIC TESTING LITIGATION,

Christina KONIZESKI, et al.,
Plaintiffs-Appellants,

v.

LIVERMORE LABS, et al.,
Defendants-Appellees.

Alice P. BROUDY, et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

Nos. 85–2842, 86–5553.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 1987.

Decided June 22, 1987.

Alan W. Sparer, San Francisco, Cal., and Ronald G. Bakal, Beverly Hills, Cal., for plaintiffs-appellants.

Marc Johnston, Washington, D.C., for defendants-appellees.

Before ANDERSON, ALARCON and HALL, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

These consolidated appeals arise out of judgments entered by the United States District Court for the Northern District of

California,[1] in actions for personal injury and wrongful death brought by or on behalf of military and civilian participants in the United States atmospheric nuclear weapons testing program. Appellees are the United States Government and private contractors who participated in the nuclear weapons testing program.

In the district court, the government moved pursuant to 42 U.S.C. § 2212, to be substituted for the contractors as defendants in these actions. The contractors joined in that motion. The government then moved to dismiss or for summary judgment in all actions based on various exceptions to its liability under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. § 2680.

The district court granted the motion to substitute the government as defendant in place of the contractors, specifically finding 42 U.S.C. § 2212 to be constitutional. It then granted the government's motion for summary judgment pursuant to the FTCA under the discretionary function exception, 28 U.S.C. § 2680(a), the foreign country exception, 28 U.S.C. § 2680(k), the combatant activities exception, 28 U.S.C. § 2680(j), and the *Feres* doctrine, *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). We affirm.

The district court, The Honorable William W. Schwarzer presiding, in its Memorandum Opinion and Order, published as *In re Consolidated U.S. Atmospheric Testing Litigation*, 616 F.Supp. 759 (N.D.Cal.1985), accurately summarized the facts, analyzed the contentions of the parties, and properly applied the law to this case. The opinion is well reasoned, and we adopt, with appropriate deletions and additions, the following portions of it as the opinion of this court.[2]

1. Consolidated with these appeals is *Broudy v. United States,* No. 86-5553, a case from the Central District of California. The issues unique to *Broudy* will be dealt with in a separate section.

2. Brackets together, in this manner [ ], without enclosing material are used to indicate deletions from the opinion of the district court; brackets enclosing materials are, unless otherwise indicated, used to denote insertions or additions by this court. Footnotes in the district court opin-

## I. FACTS

"The atmospheric nuclear weapons tests giving rise to these actions took place between the closing days of World War II and the adoption of the Partial Nuclear Test Ban Treaty in 1963. Even before these tests, the United States Government had enlisted the scientific resources of industrial firms and universities in the program to develop an atomic bomb. The Manhattan Project, which ultimately produced the bomb detonated over Hiroshima, was an unprecedented joint effort by the government, universities and industry.

"Immediately following the end of World War II, the military services proposed a series of tests to determine the effects of atomic weapons. On orders of the President, a joint military task force was established to conduct the first of these tests, Operation Crossroads, at Bikini Atoll. The task force, commanded by an admiral, comprised 42,000 military and civilian personnel and numerous ships and aircraft.

"In 1946, Congress adopted the Atomic Energy Act, (the 'AEA'), establishing a national policy for the development and control of nuclear weapons. Under the AEA, authority was transferred from the military to the Atomic Energy Commission, (the 'AEC'), which was to operate a 'program of federally conducted research and development' with the 'paramount objective of assuring the common defense and security'. AEA, P.L. No. 585, ch. 724, 60 Stat. 755, §§ 1(a), (b)(3) (current version at 42 U.S.C. § 2011 *et seq.*). To this end the AEC was authorized to conduct experiments, undertake research, and develop the military applications of atomic energy either in its own facilities or pursuant to arrangements with public or private institu-

ion have been renumbered sequentially. Where appropriate, we have added and adopted portions of First Circuit's opinion in *Hammond v. United States,* 786 F.2d 8 (1st Cir.1986). *Hammond* examined 42 U.S.C. § 2212 and held that substituting the United States as defendant in all suits against private contractors for radiation injuries arising from any of the United States atomic weapons testing programs, was constitutional.

tions. *Id.* at § 4(c)(2). All right, title and interest in fissionable material was vested in it. *Id.* at §§ 4(b), 5(a)(2). The production of atomic bombs and bomb parts was authorized, but 'only to the extent that the express consent and direction of the President of the United States has been obtained....' *Id.* at § 6(a)(2). In addition, Congressional oversight of the AEC's activities was established by creation of the Joint Committee on Atomic Energy. *Id.* at § 15(a). The AEA thus established a program of pervasive '[g]overnmental control of the production, ownership, and use of fissionable material', including the development and testing of nuclear weapons. *Id.* at § 1(b)(4).

"When the AEC took over the nuclear weapons program from the military, it acquired a complex of plants, laboratories and other facilities staffed by some 2,000 military personnel, 4,000 civilian government employees and 38,000 employees of contractors. The integral role of contractors, which started in the Manhattan Project, continued under the AEC. The University of California, Sandia Corporation and Reynolds Electrical and Engineering Co., Inc., were among those contractors.

"Escalating international tensions, marked by the Berlin blockade in 1948, the confrontation with the Soviet Union over Czechoslovakia, Greece and Iran, the detonation by the Soviet Union of an atomic device in 1949, and the Korean War led the government to assign the highest priority to the development and production of nuclear weapons. Weapons tests were an essential part of that effort.

"These tests were regarded as critical to national security. Presidents Eisenhower and Kennedy and the Chairman of the AEC made public statements stressing the vital importance of tests to the development of modern weapons needed to assure national security in the face of the threat posed by the Soviet Union. Indeed, atmospheric nuclear weapons testing was a major issue in United States-Soviet relations during this period. Beginning in 1955, testing was a topic in the disarmament negotiations. In 1958, a moratorium on tests was agreed on and was observed until the Soviet Union resumed atmospheric testing in 1961. The United States followed suit to counteract qualitative improvements in Soviet weapons. In 1963, atmospheric nuclear tests were finally banned by the Partial Nuclear Test Ban Treaty.

"From 1947 through 1963, the AEC in conjunction with the Department of Defense conducted 21 test series, some of which are the subject of these actions. These tests had a number of objectives, including developing weapons, planning their tactical and strategic use, determining how targets could be given protection, assessing the vulnerability of troops to the effects of detonations, and improving radiological safety. A particular objective of the tests was to determine the effects of nuclear explosions on the equipment, clothing, weapons and fighting capability of military personnel. The tests were coordinated with studies conducted at laboratories operated by contractors.

"Every phase of the preparation and implementation of each nuclear weapons test series was closely controlled and supervised by government officials. Initially, proposals for tests had to be approved at various levels by the responsible divisions of the AEC and the Department of Defense. Before any test took place, a detailed Operation Plan had to be reviewed and approved by the AEC, by the National Security Council, and finally by the President.

"Tests at the Pacific Proving Ground were under the control of a joint task force commander, appointed by the AEC and the Joint Chiefs of Staff. At the Nevada Test Site, tests were under the control of a Test Manager designated by the AEC. Tests were conducted in conformity with the approved Operation Plan, which incorporated radiation exposure limits established by the AEC applicable to both military and civilian personnel. Various military and civilian committees and medical and scientific experts took part in making the decisions which were incorporated into the Operation Plan. Designated units in each test orga-

nization were assigned responsibility for radiological safety.

"Nuclear weapons testing was known to be an inherently dangerous activity. Aside from the recognized radiation hazards, the risks included the dangers associated with any explosive devices, the effects of unpredictable meteorological conditions, and the risks of injury inherent in any large-scale military operation.

"The need to balance risks against test objectives was particularly acute in tests involving troop maneuvers. These tests were intended to expose troops to battlefield conditions to test psychological reactions and protective measures. The location and movement of those troops was a subject of controversy between the AEC and military commanders. It was recognized that the desire of the military to expose troops to realistic combat conditions could interfere with the AEC's weapons testing objectives. The arrangements ultimately incorporated in the Operation Plans represented an accommodation of these divergent requirements by the AEC and military officials. In later tests, involving large scale military maneuvers under battlefield conditions, these considerations led to delegation of responsibility for radiological and physical safety of troops to the military commanders.

## II. DISCUSSION

### A. Motions to Substitute—42 U.S.C. § 2212

#### 1. The Provisions and Effect of § 2212

"In October 1984, Congress adopted § 1631 of the Department of Energy National Security and Military Applications of Nuclear Energy Authorization Act of 1985, (the 'Act'), codified at 42 U.S.C. § 2212. It provides that an action against the United States shall be the exclusive remedy for injuries 'due to exposure to radiation based on acts or omissions by a contractor in carrying out an atomic weapons testing program under a contract with the United States', § 2212(a)(1), and requires any action against these contractors to be maintained solely against the United States pur-

suant to the FTCA. The Act applies to alleged acts or omissions of contractors 'without regard to when the act or omission occurred.' § 2212(a)(2).

The Act provides, in pertinent part, that: A contractor against whom a civil action or proceeding described in subsection (a) ... is brought shall promptly deliver all processes served upon that contractor to the Attorney General of the United States. *Upon certification by the Attorney General* that the suit against the contractor is within the provisions of subsection (a) ..., a civil action or proceeding commenced in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place wherein it is pending and *the proceedings shall be deemed a tort action brought against the United States....* For purposes of removal, the certification by the Attorney General under this sub-section establishes contractor status conclusively.

42 U.S.C. § 2212(b) (emphasis added).

"A 'contractor' is defined as a 'contractor or cost reimbursement subcontractor of any tier participating in the conduct of the United States atomic weapons testing program....' § 2212(d). Authority to certify pursuant to § 2212(b) that the action against the contractor 'is based on acts or omissions by a contractor in carrying out an atomic weapons testing program under a contract with the United States' rests with the Attorney General. § 2212(a)(1).

"In its statement supporting the Act, the Department of Justice explained the unique situation at which it is aimed:

[The Act] would clarify the status of certain contractors operating government-owned facilities relating to atomic energy national defense activities in litigation arising from those activities. Many actions recently have been brought against these contractors who have invaluably assisted the Government· of the United States in carrying out its nuclear weapons testing program. The actions allege exposure to radiation and conse-

quent injury or death as a result of the United States atomic weapons testing.

The provisions of the Federal Tort Claims Act determine the rights of individuals and corporate litigants to seek monetary recovery from the United States for alleged torts. Typically, the United States cannot be sued for and is not liable for the acts of independent contractors providing goods or services to the United States. However, contractors who operate nuclear weapons testing facilities for the Department of Energy or its predecessor agencies and who, as a result, have participated in the atomic weapons testing program are unique. They are not typical contract suppliers of commercially provided goods or services to the government. These contractors were and are utilized by the United States as instruments of national policy to assist in an entirely governmental task—nuclear weapons research, development and testing. Further, the government reimburses these contractors for any liability arising out of their assistance in the weapons program, including the costs of litigation. The use of the contractors to implement national policy and perform a uniquely governmental function cannot be disputed. Therefore, it should be perfectly clear that, for the purposes of civil litigation arising from atomic weapons testing, the proper party defendant is the government. Only the government sets policy, makes decisions, and controls activities and circumstances regarding atomic weapons testing.

H.R.Rep. No. 124, Part I, 98th Cong., 1st Sess. 34–35 (1983).

"The report of the Senate Committee on Armed Services elaborates the Act's underlying rationale:

Each nuclear test that has been made since 1946 has been made under the statutory direction of Congress. Each nuclear test has been approved, before the fact, by the President of the United States. Each nuclear test has been under the direct supervision of government officials. Each nuclear test has been participated in by hundreds, and in some cases thousands, of government officials and military and civilian personnel.

The committee recognizes, as has the Congress, that the military applications of atomic energy could not proceed either technically or economically without the participation of organizations that possess both scientific management skills and a high degree of scientific and technical expertise. Several such organizations were placed under contract almost at the inception of the nuclear weapons program in 1942 and have performed in an outstanding manner in the national interest for more than three decades. These organizations have provided scientific, engineering and technical support for nuclear tests carried out by the government and for the government in the exercise of a governmental function, i.e., providing for the national defense. These organizations did not order the tests to be performed; they did not set the times or places for the tests; nor did they direct military or civilian government personnel to participate in them.

S.Rep. No. 500, 98th Cong., 2d Sess. 376 (1984).

"The Senate Report described the effect of the legislation as follows:

[The Act] would cause all litigation involving the atomic weapons testing program, including suits now filed against contractors, to be maintained against the United States under the substantive and procedural requirements of the FTCA.

*Id.* at 375. By its terms, however, the Act is specifically limited to claims

for injury, loss of property, personal injury, or death due to exposure to radiation based on acts or omissions by a contractor in carrying out an atomic weapons testing program under a contract with the United States.

42 U.S.C. § 2212(a)(1).

"The instant actions [ ] qualify under the Act. The Attorney General [ ] made the statutory certification. The [appellees'] motions to substitute the United States as the sole defendant in these actions must be

granted unless § 2212 is found to be invalid."

[Appellants raise several issues concerning the constitutionality of 42 U.S.C. § 2212: (1) whether § 2212 constitutes a taking without just compensation in violation of the fifth amendment; (2) whether § 2212 violates the procedural and substantive due process requirements of the fifth and fourteenth amendments; (3) whether § 2212 violates the principle of separation of powers; and (4) whether § 2212 deprives appellants of their right to a jury trial as guaranteed by the seventh amendment.]

### 2. Constitutionality of § 2212

#### a. Fifth Amendment—Taking

"The effect of § 2212 is to substitute the remedy against the government under the FTCA for any cause of action against the contractors arising under state law. In adopting this legislation, Congress broke no new ground. In a number of other acts, Congress substituted the FTCA remedy against the government for remedies available against private parties, and these acts have been uniformly upheld. *See Ducharme v. Merill-National [sic] Laboratories,* 574 F.2d 1307 (5th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 677 (1978) (Swine Flu Act); *Carr v. United States,* 422 F.2d 1007 (4th Cir.1970) (Federal Drivers Act). *See also* 42 U.S.C. § 233 (Public Health Service medical personnel); 38 U.S.C. § 4116 (Veterans Administration medical personnel); 22 U.S.C. § 817(a) (State Department medical personnel); 10 U.S.C. § 1089(a) (Armed Forces medical personnel).

"[Appellants] contend that the Act [ ] results in a compensable taking. In a classic example of understatement, the Supreme Court has said that '[t]he question of what constitutes a "taking" for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty.' *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978)."

■ [A two-step analysis is used to determine whether a "taking" has occurred. First, is the subject matter (i.e., a pending cause of action) "property" within the meaning of the fifth amendment? Second, if so, has there been a taking of that property?]

"A cause of action has been described as a 'species of property protected by the Fourteenth Amendment's Due Process Clause.' *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)). *See also In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1312 (9th Cir.1982) (dictum).[3] [ ] It is helpful at the outset to recognize that ' "[a] claim of *deprivation* of property without due process of law cannot be blended as one and the same with the claim that property has been *taken* for public use without just compensation." ' *Kizas v. Webster,* 707 F.2d 524, 539 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (quoting J. Sackman, *Nichols' The Law of Eminent Domain* § 4.3 at 187 rev. 3d ed. cum. supp. 1982) (emphasis in original). [ ]"

[In *Ducharme v. Merrill-National Laboratories,* 574 F.2d 1307 (5th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 677 (1978), the Fifth Circuit examined the constitutionality of the Swine Flu Act, 42 U.S.C. § 247. Like § 2212, this statute provides for the substitution of the United States as the sole defendant. That court found it well settled that "a plaintiff has no vested right in any tort claim for damages under state law." *Id.* at 1309 (citing *Keller v. Dravo Corporation,* 441 F.2d 1239 (5th Cir.1971), *cert. denied,* 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972)). *See also Carr v. United States,*

---

**3.** In *Bali,* the court of appeals in dictum postulated that wrongful death claims are property within the meaning of the just compensation clause. The court, however, reserved the question whether the Warsaw Convention, limiting the amount recoverable in a wrongful death action, constituted a compensable taking.

422 F.2d 1007 (4th Cir.1970). Furthermore, in *Hammond,* the First Circuit found:

"No person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit." *New York Central R.R. Co. v. White,* 243 U.S. 188, 198, 37 S.Ct. 247, 250, 61 L.Ed. 667 (1917); *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 2638 n. 32, 57 L.Ed.2d 595 (1978); *Second Employers' Liability Cases,* 223 U.S. 1, 50, 32 S.Ct. 169, 175, 56 L.Ed. 327 (1912); *Ducharme v. Merrill-National Laboratories,* 574 F.2d 1307, 1309 (5th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 677 (1978). This is true after suit has been filed and continues to be true until a final unreviewable judgment is obtained.

*Hammond,* 786 F.2d at 12.]

"While a cause of action is considered to be a species of property, as heretofore discussed, those words do not translate into a cognizable taking claim. *See In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1312 (9th Cir.1982). Whether such a claim exists is subject to an 'essentially ad hoc, factual inquir[y].' *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. Both the nature of the property right and of the governmental invasion must be considered [to determine whether a taking has occurred.]

"Unlike contract claims, the tort claims asserted here lack 'investment-backed expectations.' " *Penn Central,* 438 at 124, 98 S.Ct. at 2659. *Cf. Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). Not only are they contingent by their nature, but they also arise in a field in which the law remains to be developed. *See, e.g., Molsbergen v. United States,* 757 F.2d 1016, 1020–25 (9th Cir. 1985).

■ "The governmental action, moreover, does not abrogate the claims but subjects them to the tort claims procedure which the plaintiffs could reasonably expect might be applied. This is true, notwithstanding the naming of contractors as defendants, because the claims arose out of activities conducted by the government and the contractors were named [by appellants] for the obvious purpose of escaping the well-known limits on the government's waiver of sovereign immunity. For these reasons, the Court concludes that [appellants] do not have a taking claim."

### b. Fifth Amendment—Due Process

### (i) Procedural Due Process

[As indicated above, a cause of action has been recognized as a species of property protected by the fifth amendment's due process clause.]

"To say that a cause of action is a species of protected property, however, is not to answer the question of what process is due. A cause of action is property of a substantially different nature than real or personal property or vested intangible rights. It is inchoate and affords no definite or enforceable property right until reduced to final judgment. *Cf. Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (state law material-man's lien entitling supplier to resort to specific property to satisfy claims is a property right compensable under fifth amendment); *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) (contract rights are property rights compensable under fifth amendment).

"A cause of action does not afford the holder the traditional bundle of rights associated with the ownership of property. *Cf. United States v. Security Industrial Bank,* 459 U.S. 70, 75–76, 103 S.Ct. 407, 410–11, 74 L.Ed.2d 235 (1982). Instead, it represents a right to assert a claim for compensation or some other form of judicial relief. Its value is contingent on successful prosecution to judgment. Thus, to the extent it is entitled to due process protection, that protection focuses on assuring access to fair procedures for its prosecution. The notion of due process relevant to causes of action is that 'deprivation ... by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.' *Mullane v. Central Hanover Bank & Trust Co.,*

339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)." [On notice of hearing, appellants were given the opportunity to present their claims before the district court. The requirements of procedural due process were thereby satisfied. The plaintiffs' claims were simply unavailing under the procedure pursued by them. Procedural due process, however, does not guarantee that a party will prevail. *Logan,* 455 U.S. at 432, 102 S.Ct. at 1155–56. To the extent that § 2212 may have abrogated appellants' causes of action by substituting the parties and remedies, this court's analysis will focus on substantive due process.]

### (ii) Substantive Due Process

[We adopt the *Hammond* court's cogent due process analysis of § 2212 with the following deletions and additions:

■ "[ ] Congress must comply with due process when abolishing or substantially modifying a common law cause of action. In that sense the right to sue is a 'species of property.' *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982); *see Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 82–94, 98 S.Ct. at 2635–41. But, an act of Congress comes to us clothed with a presumption of constitutionality, and the burden is on the plaintiff to show that it violates due process. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961).

■ "Because Congress has acted within its powers under the war powers and commerce clauses of the Constitution and there is no fundamental right or suspect classification involved here, we find that the rational basis standard of due process review applies.

■ "In applying the rational basis test to this case we follow the guidance of the Supreme Court in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 728–34, 104 S.Ct. 2709, 2717–20, 81 L.Ed.2d 601 (1984); *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 82–94, 98 S.Ct. at 2635–41; and *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. at 15–20, 96 S.Ct. at 2892–94. We find that [appellants have] not met [their] burden of showing that § 2212 is wholly arbitrary and irrational in purpose and effect, *i.e.,* not reasonably related to a legitimate congressional purpose. *See United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 174–77, 101 S.Ct. 453, 459–60, 66 L.Ed.2d 368 (1980); *Vance v. Bradley,* 440 U.S. 93, 97–98, 99 S.Ct. 939, 942–43, 59 L.Ed.2d [sic] (1979).

"The reasons asserted by the United States for Congress' enactment of § 2212 are neither arbitrary nor irrational, and can be stated simply. The United States has operated a nuclear weapons testing program for over 40 years. It initiates, designs and authorizes all nuclear tests under the program but has found it necessary to obtain the assistance of various private entities including universities and private companies for many aspects of the testing. From the late 1940's to the early 1960's a series of above-ground tests of atomic weapons were conducted with military personnel, civilian government employees and private employees of government contractors taking part. [ ] There is no dispute that these tests were designed and supervised by government officials and were individually authorized by the President. A significant number of those present at the above-ground tests have instituted suits against the government contractors involved in them for injuries caused by radiation exposure. The contractors are generally not threatened with financial liability by these suits since most of their contracts with the government included a clause making the United States indemnitor for all tort liability, including costs of litigation, arising from their participation in the testing programs. S.Rep. No. 500, 98th Cong., 2d Sess. 374–76 (1984). Congress has nevertheless perceived these lawsuits to constitute a threat to the continued participation of the private contractors in the nuclear weapons program because the contractors fear the bad publicity generated by the suits. The contractors testified be-

fore Congress that the lawsuits have led the public to blame them for the formulation, implementation and execution of the atomic weapons testing policy of the United States. H.R.Rep. No. 124, Part 4, 98th Cong., 1st Sess. 2–3 (1983). They also testified that the lawsuits result in a diversion of human and financial resources away from research and testing activities and into litigation and, therefore, seriously disrupt their participation in the program. *See Litigation Relating to Atomic Testing, 1983: Hearings on H.R. 2797 before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary,* 98th Cong., 1st Sess. 46–49 (1983). [Appellants assert] that the mere public embarrassment of the private contractors is not a rational or legitimate reason for relieving them of liability. We disagree. Even if we question the extent and effect of this public embarrassment it is not for us to reevaluate it. It is a plausible reason for Congress' action. *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. at 179, 101 S.Ct. at 461.

"Nor has Congress chosen a wholly arbitrary or irrational means to its legitimate end. [Appellants] claim[ ] that Congress created only an illusory substitute remedy in § 2212, that [ ] probably will not [ ] compensate[ ] [them] because under the terms of § 2212(a)(2) the 'limitations and exceptions' applicable to the remedies provided by § 2212 are preserved. [ ]"]

"[Appellants] argue, however, that the Act must be viewed not simply as a substitution of remedies, but rather as an abrogation of existing claims. By substituting the FTCA remedy, the claims become subject to dispositive defenses available to the government, including the *Feres* doctrine and the discretionary function exception."

["Nevertheless, although Congress could have relieved the independent contractors of their burden of defending suits for radiation injuries and still provided those injured by radiation a more generous substitute compensation scheme, we cannot say that Congress' choice of means was without any rational basis. The atomic weapons testing program has been an important, some say vital, government function from its inception. Independent contractors were used only to aid the government to carry out its program. When the program began Congress could have mandated that all tort claims arising from it be litigated through the FTCA. Under the statute as originally enacted, [appellants] had the right to sue contractors without restriction, but it was the government who paid the judgment under its indemnitor agreement with the contractor. [Appellants] had the best of both possible worlds, a right to sue free of any FTCA limitations with the government guaranteeing payment of the judgment. It was neither arbitrary nor irrational for Congress to change the law so as to place putative [appellants] in the same position as any other party suing the United States in tort. *See Hearings, supra,* at 46–48; S.Rep. No. 500, *supra,* at 377. Moreover, there may be government compensation available to many of those injured by radiation, including [appellants] here, under veterans benefits legislation, 38 U.S.C. §§ 301–363, §§ 401–423, or the FECA." *Hammond,* 786 F.2d at 14.]

[Finally, appellants argue that § 2212 cannot be applied to them retroactively. However, "[t]he retroactive application of a federal statute ... is not forbidden under the constitution so long as due process requirements are met." *Matter of Reynolds,* 726 F.2d 1420, 1422 (9th Cir.1984) (citing C.D. Sands, *Statutes and Statutory Construction,* § 41–03 (4th ed. 1973)) (footnote omitted). As a general rule, a judge should apply the law in effect on the date of a decision. *Matter of Reynolds,* 726 F.2d at 1422; *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). To comport with the requirements of due process, the retroactive application of a statute must be supported by a legitimate legislative purpose furthered by a rational means. *Pension Benefit Guaranty Corp.,* 467 U.S. at 729, 104 S.Ct. at 2717–18. "[T]he burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Id.* (quoting *Turner Elkhorn Mining Co.,* 428

U.S. at 15, 96 S.Ct. at 2892). As we discussed above, appellants have not met this burden].

### c. Separation of Powers Doctrine

■ "Congressional attempts to alter the rule of decision in pending cases in favor of the government have been condemned as a violation of Article III. *See United States v. Klein*, 80 U.S. (13 Wall.) 128, 146–47, 20 L.Ed. 519 (1871); *United States v. Sioux Nation of Indians*, 448 U.S. 371, 404, 100 S.Ct. 2716, 2735, 65 L.Ed.2d 844 (1980). The instant cases, however, do not fall within that prohibition. Section 2212 does not withdraw jurisdiction from the federal courts, does not deprive a party of the benefit of a judgment, and does not mandate the outcome of particular cases. It substitutes remedies but it leaves the application of the rules of law, including any defenses, for judicial determination. *See Dames & Moore v. Regan*, 453 U.S. 654, 685, 101 S.Ct. 2972, 2989, 69 L.Ed.2d 918 (1981).

> [T]he better reading of *Klein* is quite narrow and construes the case as holding only that Congress violates the separation of powers when it presumes to dictate 'how the Court should decide an issue of fact (under threat of loss of jurisdiction)' and purports to 'bind the Court to decide a case in accordance with a rule of law independently unconstitutional on other grounds.'

*United States v. Brainer*, 691 F.2d 691, 695 (4th Cir.1982) (quoting P. Bator, D. Shapiro, P. Mishkin & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 316 n. 4 (2d ed. 1973)). Since the Act neither directs the court to make a certain finding of fact nor requires them to apply an unconstitutional law, the separation of powers doctrine is not offended. *See also Battaglia [v. General Motors Corporation]*, 169 F.2d [254, 262 (2d Cir. 1948) ]."

### d. Seventh Amendment—Right to Jury

■ [Appellants argue that they were unconstitutionally deprived of their right to trial by jury because § 2212 makes an FTCA action against the United States the exclusive remedy for damages.[4] The court in *Hammond* held:

> There is no right to a jury trial against the sovereign under the seventh amendment, *Glidden Co. v. Zdanok*, 370 U.S. 530, 572, 82 S.Ct. 1459, 1484, 8 L.Ed.2d 671 (1962). If the United States can abolish the right to a cause of action altogether it can also abolish the right to a jury trial that is part of it. When the United States abolishes a cause of action and then sets up a separate administrative remedy against itself, as it has [with § 2212], the seventh amendment does not require that it must also provide a jury trial.

*Hammond*, 786 F.2d at 15. We agree and find that appellants were not unconstitutionally deprived of their right to a jury trial.]

"Section 2212 is therefore a valid exercise of Congressional power. The United States must be substituted as the defendant in place of the contractors, and the contractors dismissed from these actions."

### B. Motion for Summary Judgment

"Under § 2212, these actions must be treated as having been brought against the United States under the FTCA. The FTCA is a limited waiver of sovereign immunity subject to certain statutory and judicial exceptions. The government [ ] moved [and the district court granted, a motion] for summary judgment on the ground that each [appellant's] claims are barred by one or more of those exceptions.

### [1]. The Discretionary Function Exception

"The FTCA excludes any claim 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a feder-

---

**4.** The FTCA specifically provides that in tort actions against the United States, trials shall be to the court without a jury. 28 U.S.C. § 2402.

al agency or an employee of the Government, whether or not the discretion involved be abused.' 28 U.S.C. § 2680(a). The government raises the discretionary function exception as a defense to all claims raised by all [appellants].

### [a]. Claims arising out of acts or omissions in connection with the detonation of nuclear weapons.

██ "[Appellants'] first category of claims is based on injuries caused by their exposure to radiation from nuclear weapons. They may be summed up as resting on alleged negligent failures to take adequate safety precautions at the test sites.

"[Appellants] acknowledge that the decision to conduct the tests is covered by the discretionary function. They contend, however, that the Court must examine each challenged act or omission to determine whether, in the light of the policies underlying the exception, it is of the type that Congress intended to protect. According to [appellants], many of those acts involved only the exercise of what they refer to as 'scientific or professional judgment' in implementing an overall decision to conduct the atomic weapons testing program and hence are not covered by § 2680(a). *See e.g., Driscoll v. United States,* 525 F.2d 136 (9th Cir.1975). In addition, they argue that the government can be held liable for failing to enforce its own safety requirements.

"The fountainhead of jurisprudence relating to the discretionary function exception is *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The continuing vitality of that decision was recently affirmed in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense ('Varig'),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). *Dalehite* involved claims for damages against the United States arising out of a disastrous explosion of ammonium nitrate fertilizer, which had been produced and distributed under the direction of the United States for export to areas occupied by the Allied Armed Forces after World War II. Numerous acts of the government were charged as negligent:

the cabinet-level decision to institute the fertilizer export program, the failure to experiment with the fertilizer to determine the possibility of explosion, the drafting of the basic plan of manufacture, and the failure properly to police the storage and loading of the fertilizer.

"The Supreme Court concluded that these allegedly negligent acts were governmental duties protected by the discretionary function exception and held the actions barred by § 2680(a). Describing the discretion protected by § 2680(a) as 'the discretion of the executive or the administrator to act according to one's judgment of the best course,' 346 U.S. at 34, 73 S.Ct. at 967, the Supreme Court stated:

> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

*Id.* at 35–36, 73 S.Ct. at 967–68 (footnotes omitted). In the course of its opinion, the Supreme Court analyzed the legislative history of the FTCA. It noted that 'congressional thought was centered on granting relief for the run-of-the-mine accidents, as distinguished from injury from performing discretionary governmental functions,' *id.* at 28, n. 19, 73 S.Ct. at 964, n. 19, and concluded that in § 2680 'Congress exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions.' *Id.* at 32, 73 S.Ct. at 966. [footnote omitted].

"*Dalehite* is squarely on point. The argument made by plaintiffs in that case, and rejected by the Supreme Court, was essen-

**994**

tially the same as that made here, i.e., that the charges were directed not at

'any Cabinet decision ... [but] only to the mistakes of judgment and the careless oversight of Government employees who were carrying out a program of manufacturing and shipping fertilizer and who failed to concern themselves as a reasonable man should with the safety of others.'

*Id.* at 35, 73 S.Ct. at 967 (quoting petitioners' arguments).

"The specific acts of negligence charged were the temperature at which the fertilizer was bagged, the coating and bagging materials used, and the labelling of the bags. *Id.* at 39, 46–57, 73 S.Ct. at 969, 973–79. The Supreme Court found all of these acts covered by the discretionary function exception because they were 'performed under the direction of a plan developed at a high level under a direct delegation of planmaking authority from the apex of the Executive Department.' *Id.* at 40, 73 S.Ct. at 970.

"The case presented by [Appellants] is congruent with *Dalehite.* [Appellants] chose to focus their arguments on the conduct of Operation Crossroads.[5] There, too, a detailed and extensive Operation Plan was adopted on orders from the highest levels of the Executive Department.[6] An integral part of that Plan was an extensive Safety Plan which, according to [appellants] at first lacked but later contained a plan for decontamination.[7] The Safety Plan described anticipated radiation hazards, established exposure limits, and assigned responsibility for protecting personnel against exposure to unknown hazards.[8]

"[Appellants'] contention is that the government's scientists who prepared the plan 'failed to appreciate or prepare for the magnitude of the hazards that would result.' Plaintiffs' Statement of Facts at 16. They argue that 'AEC and military officials were responsible for developing safety plans to carry out Presidential and cabinet and agency-level directives to conduct the planned detonations without unduly jeopardizing the safety of the participants; for ensuring that all participants except those performing unusual or high priority missions such as cloud sampling were not subjected to radiation doses exceeding the exposure limits established by the plan; and for following other safety guidelines established in the plan, such as decontamination measures and use of protective clothing and gear..... There is substantial evidence that their negligent failure to carry out these operational tasks resulted in the overexposure of many hundreds or thousands of test participants, including the safety monitors themselves.' Plaintiffs' Op.Br. at 30.

"The nuclear weapons tests on which these actions are founded were carried out pursuant to specific legislative authority in the 1946 Atomic Energy Act, and its successor, the 1954 Atomic Energy Act, 42 U.S.C. § 2011 *et. seq.,* and presidential order.[9] They were conducted for the purpose of developing and testing weapons and discovering their effects, an inherently dangerous undertaking. The Safety Plan developed for each test series was designed to minimize exposure to radiation consistent with the purposes of the tests. The Plan provided that '[r]adiological safety of all military and civilian personnel is a com-

---

**5.** Plaintiffs' Op.Br. at 3. That operation, according to plaintiffs, epitomizes the nuclear weapons testing program at its worst: "In hindsight Operation Crossroads was an extraordinary fiasco, America's first nuclear disaster. The Joint Task Force took a radiation bath without adequate resources to deal with the decontamination problems that ensued." *Id.* at 76.

**6.** Government Exhibits E–7.10–7.15. Operation Plans for subsequent tests may be found at Government Exhibits E–8 (Operation Buster-Jangle), E–9 (Operation Castle), E–10 (Operation

Redwing), E–11 (Operation Hardtack), E–12 (Operation Ivy), and E–13 (Operation Dominic I).

**7.** Government Exhibits E–7.3 to E–7.7. Extensive Safety Plans were a part of the Operation Plan for each test. *See, e.g.,* Operation Plan for Operation Castle, Government Exhibit E–9, at N–I to N–III–2.

**8.** Plaintiffs' Statement of Facts, at 11–16.

**9.** *See* Government Exhibits E–14 to E–26.4.

mand responsibility.'[10] While the Plan established radiation exposure limits, it was subject to the authority of the officer in charge of any particular test, who could permit exposure in excess of the established level if the exigencies of the situation required. Thus the Plans specified that compliance with exposure limits was conditioned upon operational requirements:

Due to the special nature of field tests it is considered that a policy of strict adherence to the radiological standards prescribed for routine work is not realistic. The regulations set forth herein have been designed as a reasonable and safe compromise considering conservation of personnel exposures, the international import of the test and the cost aspects of operational delays chargeable to excessive radiological precautions. In all cases other than emergencies or tactical situations, the ultimate criteria will be limited by the MPEs [maximum permissible exposure] for personnel. Special instances may arise ... in which operations will be carried out without regard to the MPEs and MPLs [maximum permissible level] prescribed herein. For such emergency or tactical operations the criteria prescribed below for tactical situations will be used as a guide.[11]

"The Safety Plan incorporated into the Operation Plan contemplated that judgments and decisions concerning exposure to radiological hazards and the degree of protection to be afforded would be made in the light of the objectives and the needs of the test program. Safety decisions, therefore, were a part of the policy decisions made in the conduct of the weapons tests, [ ] and they fall squarely within the articulation in *Dalehite* that

[w]here there is room for policy judgment and decision there is discretion.

346 U.S. at 36, 73 S.Ct. at 968. That those judgments and decisions may have been made by scientists or other operational personnel does not affect the application of the discretionary function exception. As stated by the Court in *Varig*, 'it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies....' [467 U.S. at 813], 104 S.Ct. at 2765.[12]

"In these actions, the decisions concerning safety were in the first instance made by those charged with the preparation of the Operation Plan and its components. The responsibility for carrying out the Safety Plan was assigned to the officials in charge of the tests who had discretion to adopt and modify the Plan as necessary to achieve the objectives of the test. A court would be ill-equipped to evaluate the judgments concerning safety made by those officials based on the exigencies of the moment. Any attempt to do so would, moreover, require a comprehensive reexamination of the conduct of the tests and the decisions made during their course which would itself defeat the purpose of the exception. The consequences of such a reexamination would be to hamper the government in its future conduct of weapons tests and similar operations affecting the national security.[13]

[Finally, the appellants argue that the discretionary function exception does not bar their challenge to the government's alleged negligent failure to supervise the contractor's compliance with the safety procedures and guidelines established by

---

**10.** Government Exhibit I–4, at 1. *See also* Government Exhibits J–5, at 3; I–1, at 3; E–11, at K–1; J–3 at 1.

**11.** Joint Task Force Seven, Command Task Group 7.3, *Operation Plan,* December 7, 1953, Government Exhibit J–21, at G–I–1. *See generally* references cited in Government Memo, in Support of Summary Judgment (Discretionary Function) [ ].

**12.** The pre-*Varig* criterion of looking at whether the decision was made at the planning level or operational level is no longer valid in view of the Supreme Court's statement in *Varig. See also Begay v. United States,* 768 F.2d 1059, 1062–63 n. 2 (9th Cir.1985).

**13.** The appropriateness of deciding issues of governmental immunity on summary judgment to avoid unnecessary inquiries disruptive of effective government was stressed by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 816–17, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

the Safety Plan. Appellants rely heavily on *Gardner v. United States*, 780 F.2d 835 (9th Cir.1986) for the proposition that, under California law, there is a "nondelegable duty to ensure adequate safety precautions were taken by an independent contractor" where the work to be performed involves special dangers. *Garnder*, 780 F.2d at 837 (citing *Rooney v. United States*, 634 F.2d 1238 (9th Cir.1980)). Furthermore, the United States can be liable under the FTCA for breaching this non-delegable duty. *Gardner*, 780 F.2d at 837. This case is clearly distinguishable. The discretionary function exception was not raised nor discussed. Furthermore,

It is irrelevant to the discretion issue whether the AEC or its employees were negligent in failing to adequately protect the public. *See Cisco v. United States*, 768 F.2d 788, 789 (7th Cir.1985); *General Public Utilities Corp. v. United States*, 745 F.2d 239, 243, 245 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1985). [ ] When the conduct at issue involves the exercise of discretion by a government agency or employee, § 2680(a) preserves governmental immunity 'whether or not the discretion involved be abused.' "

*Allen v. United States*, 816 F.2d 1417 (10th Cir.1987) (footnotes omitted). *See also Cunningham v. United States*, 786 F.2d 1445 (9th Cir.1986) (negligent failure to inspect falls within discretionary function exception—"When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." (quoting *Varig*, 467 U.S. at 819–20, 104 S.Ct. at 2767)).

Furthermore, the Act is specifically limited to claims "for injury, loss of property, personal injury, or death due to exposure to radiation based on acts or omissions *by a contractor* in carrying out an atomic weapons testing program under a contract with the United States." 42 U.S.C. § 2212(a)(1) (emphasis added). Section 2212 is not designed to cover the negligence of the government itself.]

"Accordingly, [Appellants'] claims based on failures to take adequate safety precautions at tests must be dismissed. [footnote omitted].

**[b]. Claims Based on the Government's Failure to Issue Warnings Prior to 1977.**

■ "[Appellants'] second category of claims is based on the breach of the government's alleged duty to warn [appellants] of the dangers to which they had been exposed or to monitor test participants for health problems resulting from radiation exposure. [This court] has postulated that California courts would impose a duty on the government to warn test participants of the dangers to which they have been exposed. *See Molsbergen v. United States*, 757 F.2d 1016, 1020–25 (9th Cir. 1985). Such a duty would exist when a test participant could show that (1) the government has information relating to a serious risk to the life, safety or health of a participant; (2) the conduct of the government gave rise to the risk; (3) the burden resulting from imposition of a duty to warn is not onerous; and (4) there is reason to believe that a warning would have some practical effect. *Id.* For purposes of this ruling, it is assumed that the government failed to provide [appellants] with any warning of the health risks of exposure to radiation until 1977.

"The government's motion is not directed at whether it had a duty to warn. Rather, the government argues that in these cases the government's failure to warn involved the failure to perform a discretionary function and that the claims are therefore barred.

"Assuming the government had a duty to warn, the threshold question in determining whether the discretionary function applies is what, if any, warning measures it was obliged to undertake on behalf of test participants prior to 1977. This is not a case of failing to warn river users of a hidden obstruction beneath the surface, *Lindgren v. United States*, 665 F.2d 978 (9th Cir.1982); or park users of the risk of flash floods, *Ducey v. United States*, 713

F.2d 504 (9th Cir.1983); or a treating physician of his patient's dangerous propensities, *Jablonski v. United States,* 712 F.2d 391 (9th Cir.1983). The kind of 'warning' that these cases involve is best illustrated by the program the government did undertake beginning in 1977 on the strength of findings by the Centers for Disease Control of a leukemia cluster among test participants. At that time the Defense Nuclear Agency established the Nuclear Test Personnel Review ("NTPR") program. It began to assemble and publish voluminous materials concerning radiation exposure during tests and to calculate levels of exposure of personnel. Beginning in 1979, test participants whose records indicated significant radiation exposure were notified and provided with medical examinations. The notification and examination program was gradually expanded to include personnel who had received lower doses. It was also extended to the Department of Health, Education and Welfare which began to conduct studies and a public information program.[14]

"The decision to embark on this program entailed a commitment of substantial resources, including the assignment of a large number of employees and the expenditure of large sums of money. The initial cost of the NTPR alone was $6,000,000 per year. The program required difficult judgments balancing the magnitude of the risk from radiation exposure—of which there was only fragmentary knowledge—against the risks and burdens of a public program. Those risks included the potential consequences of creating public anxiety and the health hazards inherent in the medical responses to the warning.[15]

"Thus any decision whether to issue warnings to thousands of test participants of possibly life-threatening dangers and to provide them with appropriate examinations and counseling calls for the exercise of judgment and discretion at high levels of government. The difficulty of such decisions is illustrated simply by the problem of how to phrase such a warning where the degree of exposure of any particular participant and the consequent risk is not known.[16] A decision must also take into account sensitive questions concerning its impact on on-going and future tests and on the military and civilian participants.[17]

**14.** *See* the discussion and references cited at Government Memo, in Support of Summary Judgment (Discretionary Function) [ ]; Government Reply Memo [ ].

**15.** *See* E. Robin, *Matters of Life & Death: Risks v. Benefits of Medical Care* (1984), which discusses the health hazards inhering in any widespread campaign to warn against and detect disease. Diagnostic tests, by reason of the intrusive procedures used, false positive indications, and sometimes unwarranted psychological effects, produce their own adverse consequences which must be taken into account.

The experience under the government's 1976 Swine Flu Program illustrates the hazards of a hasty reaction to a health program, the dimensions and seriousness of which are not yet known at the time. Although the probability of an epidemic was never established, the public was strongly urged to submit to immunization with little advice respecting its attendant hazards. R. Neustadt, *Swine Flu Affair: Decision-Making on a Slippery Disease* 86–97 (1978); Gray, "Complexities of Informed Consent," 437 *Annals Am. Academy Pol. & Soc. Sci,* 37, 44 (May, 1978); Centers for Disease Control, *Public Attitudes Toward the Swine Flu Immunization Program and Medical Coverage of Events* 2–7 (1981). The government's experience with the swine flu program highlights the policy and cost/benefit tradeoffs involved in large-scale public responses to perceived health problems.

**16.** Not the least of the problems the government would face is that once having undertaken to issue a "warning", it may come under an obligation to exercise due care toward members of the public relying on it. *See Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955) (not decided under the discretionary function exception).

**17.** Studying the psychological reactions of troops to nuclear weapons during field tests was a specific goal of many of the tests. *See, e.g.,* Characteristics of Troops with Varying Levels of Information about Atomic Effects, Government Exhibit D–67; Memorandum for the AEC Chairman, July 16, 1951, Government Exhibit K–14. To carry out such studies and achieve test objectives, the government needed complete control over information supplied to the troops. Troops were to be indoctrinated on how to conduct themselves on the nuclear battlefield. As one officer explained, the goal was to teach soldiers to respect radioactivity, not to fear it. Capt. Frank Winant, Command Problems of Atomic Defensive Warfare, Sept. 1947, Government Exhibit J–13.

"In no sense can such a decision be equated with decisions to warn of submerged obstructions to navigation or flash floods.[18] Courts cannot be considered qualified to evaluate such a decision and any attempt to do so is likely to interfere with important governmental activities. Formulating and issuing warnings requires the government 'to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding.' *Varig,* [467 U.S. at 820], 104 S.Ct. at 2768. The conclusion is inescapable that every aspect of a warning program is a matter that falls within the discretionary function exception as defined in *Dalehite* and *Varig:*

Where there is policy judgment and decision there is discretion.

346 U.S. at 36, 73 S.Ct. at 968. The decisions of [this court], discussed in the immediately preceding section, compel the same result.

"[Appellants] argue that the discretionary function exception cannot apply in the absence of a 'conscious decision.'[19] The statute is not so limited; it exempts '[a]ny claim based upon ... the failure to exercise or perform a discretionary function ...' 28 U.S.C. § 2680(a). The language is directed at the nature of the conduct, and does not require an analysis of the decision-making process. *Cf. General Public Utilities Corp. v. United States,* 745 F.2d 239, 245 (3d Cir.1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1985) (the exemption is based on the nature of the conduct, 'not whether there is an option to choose'). When enacting § 2680, 'Congress exercised care to protect the Government from claims, *however negligently caused,* that affected the governmental functions.' *Dalehite,* 346 U.S. at 32, 73 S.Ct. at 966 (emphasis added).

"If the decision to issue or not to issue a 'warning' is within the discretionary function exception, then logically the failure to consider whether to issue one necessarily

**18.** *See, Begay v. United States,* 768 F.2d 1059 (9th Cir.1985); *First Nat'l Bank in Albuquerque v. United States,* 552 F.2d 370, 374–77 (10th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977) (decision by Department of Agriculture whether label on fungicide complied with statutory requirement that it contain a warning "necessary and if complied with adequate to prevent injury" fell within discretionary function exception).

**19.** *See Allen v. United States,* 588 F.Supp. 247, 337–40 (D.Utah 1984).

[The district court's decision in *Allen* was overturned by the Tenth Circuit in *Allen v. United States,* 816 F.2d 1417 (10th Cir.1987). In that opinion, the Tenth Circuit specifically rejected the District oof Utah District Court's "deliberate choice" or "conscious decision" analysis which was heavily relied upon by the appellants in this case. The Tenth Circuit held:

It is also irrelevant whether the alleged failure to warn was a matter of "deliberate choice," or a mere oversight. *See Allen,* 588 F.Supp. at 337–38. We agree with the treatment of this distinction in *Myslakowski v. United States,* 806 F.2d 94 (6th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987):

"The critical error in the trial court's analysis is in its conclusion that because the evidence does not show that the departmental policymakers evaluated the pros and cons of requiring that a warning be given concerning the rollover propensity of the jeep and then made a discretionary decision not to give such warnings, it therefore follows that no discretionary decision, of the kind contemplated by § 2680(a), was made....

Stated otherwise, even the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made.

Indeed, it is, in part, to provide immunity against liability for the consequences of negligent failure to consider the relevant, even critical, matters in discretionary decisionmaking that the statutory exception exists. If it were otherwise, a judgment-based policy determination made at the highest levels, to which all would concede that the statutory exception applies (the decision to sell surplus jeeps), would result in no immunity if the decision could be shown to have been made without consideration of important, relevant factors, or was a decision negligently reached. If that reasoning were sound, the discretionary function exception would be inapplicable in every case in which a negligent 'failure to consider' a relevant risk could be proved." *Id.* at 97–98. *Accord In re Consolidated United States Atmospheric Testing Litigation,* 616 F.Supp. 759, 776–77 (N.D.Cal.), *appeal docketed,* No. 85–2842 (9th Cir.1985). *Allen,* 816 F.2d at 1422 n. 5.]

falls within the exception as well. Any other interpretation of the statute would create insurmountable problems in its administration: What would constitute a 'decision'? Would a decision to defer decision be a 'decision'? Would the government be subject to liability for failing to act where operational employees conducting the relevant research consider the evidence as yet insufficient for making a decision? As the Supreme Court said in *Varig*, one must look to 'the nature of the conduct' to determine whether the exception applies. In this case, the relevant conduct is the issuance of 'warnings,' not the decision-making process or the failure to make a conscious, explicit decision.

"Accordingly, plaintiffs' claims based on the failure to issue warnings must also be dismissed".[20]

### C. *Broudy* Appeal

Appellant Alice Broudy, decedent's wife, appeals from the United States District for the Central District of California's granting of the government's motion for summary judgment. In granting that motion, the Honorable Judge Laughlin E. Waters adopted the reasoning of the decision in *In re Consolidated United States Atmospheric Testing Litigation*, 616 F.Supp. 759 (D.C.Cal.1985) ("Konizeski appeal") and held, *inter alia*, that the discretionary function exception barred Broudy's post-discharge failure to warn and her medical malpractice claims. We affirm.

Major Broudy served as an officer in the U.S. Marine Corps from 1944 to 1960. In 1957, Major Broudy was ordered to participate in military exercises near two atmospheric tests conducted in Nevada.

Major Broudy was honorably discharged in 1960. He received medical care for various health problems at the Marine Corps medical facility at El Toro. He was never informed of nor warned about the dangers associated with his exposure to radiation. In 1976, he was diagnosed as having lymphosarcoma, a form of cancer that has been related to radiation exposure. He died from that disease in 1977.

Broudy, by stipulation, joined in all arguments and precedent advanced by the appellants in the Konizeski appeal on the issue of the government's post-discharge failure to warn and the applicability of the discretionary function. For the same reasons and policy considerations stated above in the Konizeski appeal, we find that the government's post-discharge failure to warn Major Broudy of any harm arising from his exposure to radiation is barred by the discretionary function exception to the FTCA.

 Broudy has attempted to distinguish her husband's case from the Konizeski appellants by asserting a medical malpractice claim. Specifically, she contends the medical personnel at the El Toro Medical Facility committed medical malpractice when they failed to warn Major Broudy of the dangers of radiation exposure when he went to the facility for post-discharge treatment. The district court held that this medical malpractice claim was barred for failure to state a sufficient claim to the appropriate federal agency. We agree.

28 U.S.C. § 2675(a) provides that as a prerequisite to maintaining a suit under the FTCA, a plaintiff must first present the claim to the appropriate federal agency. By enacting the notice requirement, Congress sought to ensure that plaintiffs "would promptly inform the relevant agency of the accident so that it may investigate the claim and respond either by settlement or by defense." *Broudy v. United States*, 722 F.2d 566, 568 (9th Cir.1983) (quoting *Adams v. United States*, 615 F.2d 284, 289 (5th Cir.1980)). The purpose of this notice requirement is to give the relevant agency an opportunity to commence an investigation into the claim. *See Broudy*, 722 F.2d at 568. Broudy's administrative claim was filed with the Department of Energy ("DOE"). The Department of Defense ("DOD") controls the medical facility at El Toro. The DOD received no notice of Broudy's claim. As a consequence, the

---

**20.** Because we dismiss all appellants' claims under the discretionary function exception, we do not reach the *Feres* doctrine, foreign country exception or the combatant activities exception.

DOD was unable to initiate an investigation into her claims. We agree with the district court that Broudy's medical malpractice claim is barred because she failed to file the claim with the DOD which was the appropriate federal agency.

The judgments are AFFIRMED.