TORRUELLA, Circuit Judge
(Dissenting).
The majority strikes a melancholic chord in its treatment and analysis of the Plaintiffs’ allegations in this case. Sadly, this is the same chord that has reverberated throughout the long-standing continuum of disputes and grievances between the Unit *104 ed States citizens residing in Puerto Rico’s two off-shore municipalities of Culebra and Vieques, and the Government of the United States. It resonates even more tellingly in this appeal when considered in the light of the turbulent history of this relationship.
The first chapter of this sorry tale commenced in 1941, when the United States expropriated the overwhelming majority of the lands in Vieques and Culebra, thereafter declaring them to be military reservations. In the remaining areas there existed, and continue to exist to this day, full scale civilian communities with organized municipal governments that are fully integrated to the rest of the political system of the Commonwealth of Puerto Rico.[13] These communities were thereafter encapsulated within the surrounding federal lands.[14]
Since the Government of the United States took possession of these lands, the U.S. Navy has almost continuously conducted military exercises involving air, naval, and field artillery bombardments with live and inert munitions on both Culebra and Vieques, as well as amphibious and land operations by the Marine Corps, the latter of which predominantly took place in Vieques.[15] The seething, unresolved controversies generated by these activities, affecting the daily lives of the civilian residents of Vieques and Culebra, as well as a significant number of the general population of Puerto Rico, led to predictable consequences.
In 1975, the Navy was forced to terminate its operations in Culebra[16] and to transfer its aerial and naval bombardments to Vieques. Because of the resulting increased intensity of these activities in Vieques[17]—an island with a substantially larger civilian population than that of Culebra—matters were exacerbated to the point that these actions became politically untenable for the Navy,[18] forcing it to to *105 tally close its ranges and maneuvering areas in Vieques in 2003.[19] Finally, in 2004, the Navy abandoned the support base for the Culebra/Vieques complex—the Roosevelt Roads Naval Air Station[20] in nearby Ceiba, Puerto Rico.[21]
This Court has played an important role in this unhappy tale, having contributed in no small way to buttressing one side of the United States-Culebra/Vieques conundrum in a plethora of civil and criminal cases,[22] the outcome of which, in retro *106 spect, only served to fuel an already hot fire.
This Court’s dissonant tune reaches a crescendo in the present case with the majority’s incorrect finding that Plaintiffs’ complaint fails to allege sufficient facts to overcome the government’s motion to dismiss pursuant to Rule 12(b)(1). As will be shown, the majority fails to properly credit Plaintiffs’ supported jurisdictional averments, and goes too far in carving out an unwarranted exception to the Federal Tort Claims Act’s (FTCA) waiver of sovereign immunity for the exercise of military authority. I am thus compelled to dissent.
I.
On September 5, 2007, Juanita Sánchez, on behalf of her minor child, Debora Rivera-Sánchez, and 7,124 additional residents of Vieques, filed their complaint in this case.[23] The United States responded by filing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), alleging lack of subject matter jurisdiction. The district court granted this motion, relying principally on our decision in Abreu v. United States, 468 F.3d 20 (1st Cir.2006), in which we held that an action for damages was not available under the FTCA for a violation of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 et seq.
Although the majority pays lip service to the well-established rule that on a Rule 12(b)(1) motion a court must “credit the plaintiffs well-pled allegations and draw all reasonable inferences in the plaintiffs favor,” Maj. Op. at 92 (citing Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010)), its application of this precept to the instant case is permeated with an unwarranted skepticism of Plaintiffs’ claims, a condition which results in an improper under-valuation of the allegations in the complaint. I will therefore, first, explore the legitimate boundaries of Rule 12(b)(1), and second, apply them to the allegations of Plaintiffs’ complaint and their relevant jurisdictional averments.
This Court “afford[s] plenary review to a district court’s order of dismissal for lack of subject matter jurisdiction.” Muniz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir.2003). “At the pleading stage, such an order is appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction.” Id. In assessing whether the plaintiff has put forward an adequate basis for jurisdiction, “the court must credit the plaintiffs well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in [the plaintiffs] favor, and dispose of the challenge accordingly.” Valentín v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir.2001). See also Merlonghi, 620 F.3d at 54 (on a motion to dismiss for lack of *107 subject matter jurisdiction the court may also “consider whatever evidence has been submitted, such as [] depositions and exhibits”) (quoting Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir.1996)).
This standard is the same as is applied on a Rule 12(b)(6) motion. See MeCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir.2006) (“Under either [Rules 12(b)(1) or 12(b)(6)], we review the lower court’s order de novo, accepting the plaintiffs’ well-pleaded facts as true and indulging all reasonable inferences in their behocf.”). We recently clarified in Ocasio-Hemández v. Fortuno, 640 F.3d 1 (1st Cir.2011), how this “well-pleaded facts” standard should be applied, and set forth a highly relevant discussion of what the Supreme Court’s specific determinations were in the two leading cases in this area of the law, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), as to a plaintiffs actual burden at the motion to dismiss stage. Importantly, Ocasio-Hemández indicates that under Twombly, “ ‘we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.’ ” 640 F.3d at 8 (quoting Tioombly, 550 U.S. at 570, 127 S.Ct. 1955).
Per the Iqbal decision, we described the “two-pronged approach ... implicit in [ ] Twombly,” pursuant to which we must first separate a complaint’s factual allegations from its legal conclusions. Ocasio-Hernández, 640 F.3d at 10. “The second prong ... requires a reviewing court to accept the remaining factual allegations in the complaint as true and to evaluate whether, taken as a whole, they state a facially plausible claim.” Id. at 10-11 (emphasis added). Moreover, “[n]on-conclusory factual allegations ... must [ ] be treated as true, even if seemingly incredible.” Id. at 12 (citing Iqbal, 129 S.Ct. at 1951). We emphasized that the court should not “attempt to forecast a plaintiffs likelihood of success on the merits,” and instead should “evaluate the cumulative effect of the factual allegations.” Id. at 13-14. In short, “[t]he question confronting a court on a motion to dismiss is whether all the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiffs [sic] entitlement to relief plausible.” Id. at 14 (relying on Twombly, 550 U.S. at 569 n. 14,127 S.Ct. 1955).
Applying these guidelines to the allegations raised in the complaint and to all of the relevant evidence proffered in support of jurisdiction, Merlonghi, 620 F.3d at 54, it is clear that Plaintiffs in this case have met their jurisdictional burden. It is also obvious that the majority has failed to judge the complaint by the rules that have just been recited.
II.
I begin with the incontrovertible proposition that Plaintiffs are suing under the FTCA, not the Clean Water Act (CWA).[24] *108 As will be discussed infra, however, the Navy’s alleged violations of its National Pollutant Discharge Elimination System (NPDES) permit, as well as other mandatory directives, are what allow Plaintiffs to proceed under the FTCA because their law suit falls outside the discretionary function bar of the statute. See Berkovitz v. United States, 486 U.S. 531, 544, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (“When a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply.”). Under the FTCA the United States “shall be liable ... relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances.... ” 28 U.S.C. § 2674. This is a liability that includes “the military departments” and “members of the military or naval forces of the United States.” Id. § 2671. The FTCA does not apply, however, to “[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government....” Id. § 2680(a). Thus, any claim based on the law of the jurisdiction where the alleged tort takes place is a valid FTCA claim, provided that an administrative claim has been duly filed pursuant to 28 U.S.C. § 2675 (requiring exhaustion of administrative remedies), and that the discretionary function exception (or any other statutory exception) does not apply.[25]
Leaving aside for the moment the issue of the discretionary function exception, Plaintiffs allege eight causes of action under Puerto Rico law which, if proven, would allow them to recover compensatory damages from the Navy as if it were “a private individual in like circumstances.” Id. § 2674. Of these, Count I, alleging negligence under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141, claims, among other things, that despite the Navy’s knowledge that its various activities created dangerous, toxic conditions within the Atlantic Fleet Weapons Training Facility (AFWTF)—as the Vie-ques Naval Reservation was officially called—the Navy negligently failed to warn the citizens of Vieques of the presence and harmful effects of the “numerous known carcinogenic compounds and substances, heavy metals, and other known dangerous substances, compounds, elements, and[] materials” present in the AFWTF and surrounding waters. Plaintiffs also argue that the Navy knowingly invited the residents of Vieques to enter *109 onto its contaminated property for the purpose of fishing and cattle herding.
Article 1802 of Puerto Rico’s Civil Code imposes liability for tort damages on “[a] person who by an act or omission causes damage to another through fault or negligence.” P.R. Laws Ann. tit. 31, § 5141. Liability turns on three basic elements: (1) evidence of physical or emotional injury, (2) a negligent or intentional act or omission (the breach of duty element), and (3) a causal nexus between the injury and the defendant’s act or omission (ie., proximate cause). Vázquez-Filippetti v. Banco Popular de P.R., 504 F.3d 43, 49 (1st Cir.2007) (citing Torres v. KMart Corp., 233 F.Supp.2d 273, 277-78 (D.P.R. 2002)). “As is true in most jurisdictions, foreseeability is a central issue in these cases, as it is an element of both breach of duty and proximate cause.” Id. at 49 (citation omitted). “[A] defendant only breaches his duty if he acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk.” Id. (citation omitted); see also Malave-Felix v. Volvo Car Corp., 946 F.2d 967, 971-72 (1st Cir.1991) (as to proximate cause, “[a] person is liable for injuries that a prudent person reasonably could anticipate”) (citing Pacheco v. A.F.F., 12 P.R.Offic.Trans. 367, 372,112 P.R.Dec. 296 (1982); Jimenez v. Pelegrina Espinel, 12 P.R.Offic.Trans. 881, 888,112 P.R.Dec. 700 (1982)).
As previously detailed, since the 1940s, and until 2003, the Navy owned approximately 22,000 of Vieques’s 33,000 acres and employed them for use as a training ground and live ordnance range. At a minimum, at least as far back as 1979, when Romero-Barcelo v. Brown, 478 F.Supp. 646 (D.P.R.1979), aff'd in part, vacated in part, 643 F.2d 835 (1st Cir. 1981), rev’d sub nom. Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), was decided,[26] the Navy was made aware of the maximum concentrations of various toxic substances that were legally allowed to be deposited in the waters of Vieques.[27] Pursuant to my order in that case, the Navy sought an NPDES permit. Thereafter, Permit No. PRG990001 (the “Permit”) was issued to the Navy on October 30, 1984 for its AFWTF operations. See Authorization To Discharge Under the National Pollutant Discharge Elimination System, 49 Fed. *110 Reg. 43,585-02 (Oct. 30, 1984). This document, which is part of the record in this case, purports to regulate the Navy’s discharge of ordnance into the waters of Vie-ques during training exercises. It incorporated a 1983 Water Quality Certificate from the Puerto Rico Environmental Quality Board (EQB) and required the Navy to meet either of the following limitations: (1) water quality-based numerical limits, “as required by the Puerto Rico [EQB] Certification of October 11, 1983” which assured compliance with EQB’s water quality standards, as provided by Section 401(d) of the CWA, or (2) natural background concentrations (NBCs), whichever is higher. Id. at 43,586. The Permit also required that “[a]t no time shall the maximum values contained in the effluent exceed the water quality standards after mixing with the receiving water.” Id. at 43,589.
Plaintiffs allege in their complaint, and the record reflects, that from 1985 through 1999, the Navy reported measurements of discharges of heavy metals and other materials into the waters of eastern Vieques, which contained lead, barium, cadmium, arsenic, boron, cyanide, hexavalent chromium, and thirteen other substances in violation of the CWA and the Puerto Rico EQB’s water quality standards. On August 27, 1999, the EPA determined that the Navy had violated the Permit and sent notice of these violations in a letter by Deputy Regional Director for EPA-Region II, William Muszynski, addressed to Assistant Secretary of Defense Frank Rush. The letter states that, based on the Navy’s own Discharge Monitoring Reports (DMRs) for the period of 1994 through April 1999, the EPA had “documented 102 exceedances of the water quality-based permit limits” for toxic substances, including: boron, cadmium, chromium (hexavalent and total), copper, iron, lead, manganese, mercury, oil and grease, phenolics, selenium, silver, sulfide, and zinc. The EPA also stated that due to the Navy’s monitoring deficiencies “[t]he potential for a greater number of actual violations exists than is evidenced in the DMRs.” Thereafter, on September 15, 1999, the Navy was formally notified through Captain J.K. Stark, the Commanding Officer of the Roosevelt Roads Naval Air Station and under whose direction and command the Vieques AFWTF operated, that the Navy “ha[d] violated the Clean Water Act.”
Plaintiffs claim that notwithstanding the “web of reporting requirements ... [, which] should have triggered a warning to the people of Vieques, many of whom live off the land by eating fish and fowl and local wildlife,” the Navy not only failed to warn Plaintiffs of these hazards, but in fact facilitated their exposure to them by allowing fishermen and cattlemen to enter the AFWTF to engage in these activities. Plaintiffs proffered an article published in 2005 by the International Journal of Environmental Research and Public Health, which indicates that “[f]rom 1984 to 2000, the U.S. Navy allowed local farmers to graze cows in the eastern part of Vieques including at the AFWTF. The potential for direct exposure and the impact on human health is exemplified by this pathway.”[28] This assertion is supported by language in the Range Manual for the AFWTF, also proffered into evidence, indicating the following at parts 404(d) and (e):
Livestock. Cattle graze on land extending into the [Eastern Maneuvering Area]. Cattle and wild horses often wander into the [Live Impact Area] and should never be intentionally fired upon....
*111 Fishing Activity. Fish traps are set off the eastern half of Vieques ... Fishermen often set traps in OPAREAs A, B, C, D and H of R-7104 ... and recover traps when the range is cold. Surface units shall watch for these floats to avoid running them over.
The Range Manual further indicates that “[t]he [i]nner range is closed every Tuesday and Friday from 0700Q-0900Q to permit local fishermen to retrieve fishing traps from adjacent waters.” It is alleged that this pattern of allowing fishermen and cattlemen to enter the AFWTF not only exposed those citizens directly to the hazards of the contaminants, but also subjected the rest of the residents of Vieques to the same, such as Plaintiffs who consumed the products of fishing and grazing activities.
Indeed, the complaint provides the following allegations: detection of benzene and toluene in the groundwater under the civilian sectors of Vieques; detection of high concentrations of lead, cadmium, manganese, copper, cobalt, and nickel in the vegetation; high concentrations of arsenic, iron, nickel, zinc, cadmium, cobalt, lead, and copper “in the sea grasses on and surrounding Vieques”; high concentrations of cadmium and lead detected in the crab population; and high amounts of mercury, selenium, arsenic, and zinc detected in fish populations. Additionally, the Plaintiffs reference studies conducted in February and March of 2000 by biologist Dr. Arturo Massol-Deyá and radio-chemist Elba Diaz, who found unacceptably high levels of cadmium, nickel, cobalt, and manganese in crabs. According to Dr. Massol, further studies show that vegetables and crops in civilian areas were highly contaminated with lead, cadmium, copper, and other metals; plants had ten times more lead and three times more cadmium than samples from the Puerto Rico mainland, as well as excessive amounts of nickel, cobalt, magnesium, and copper; and goats grazing in the AFWTF’s grasslands contained five to seven times more cadmium, six times more cobalt, and five times more aluminum than those found in the Puerto Rican mainland.
The complaint further claims specific harm to Vieques residents, alleging “[t]hat according to hair studies done to determine the presence of heavy metals in humans on Vieques[,] the following contaminants were discovered in Vieques residents: [tjoxic levels of mercury; [tjoxic levels of lead [ ]; [ajrsenic contamination; [cjadmium contamination; [aluminum contamination; [and ajntimony contamination.” The complaint also alleges that “scientific studies have found the following non-native contaminants in high concentrations in the people of Vie-ques: cobalt, copper, nickel, vanadium, palladium, iron, magnesium, manganese, silicon, cerium, dysprosium, lanthanum, neodymium, praseodymium, silver, ytterbium, and tellurium.” Specifically, studies of hair samples from Vieques residents collected by Dr. John Wargo, a professor of Risk Analysis and Environmental Policy at Yale University, showed high levels of mercury and other contaminants, including lead, cadmium and arsenic; studies carried out by Dr. Carmen Ortiz Roque, an epidemiologist and physician, also confirmed these findings. It is additionally claimed that residents of Vieques experience a 30% higher cancer rate, a 381% higher hypertension rate, a 95% higher cirrhosis rate, and a 41% higher diabetes rate than persons in the rest of Puerto Rico. Further, studies reflect that as a result of the Navy’s activities in Vieques, the island’s infant mortality rates have increased since 1980, and babies born in Vieques have a 33% low-weight rate, as well as a pre-term deliv *112 ery rate that is higher than in mainland Puerto Rico.
The complaint further alleges that tests performed on hair samples from Plaintiff Debora Rivera-Sánchez, a 9-year-old female resident of Vieques, found toxic levels of lead, cadmium, and aluminum; Plaintiff Lionel Colon-Adams, a 9-year-old male resident of Vieques, similarly alleges that tests performed on his hair samples yielded toxic levels of aluminum, arsenic, lead, and cadmium. Plaintiff Rivera-Sánchez also alleges that she has been diagnosed to be suffering from anemia and stomach problems, while Plaintiff Colon-Ayala claims to have been diagnosed with respiratory and stomach problems. Both plaintiffs claim that, according to the Agency for Toxic Substances and Disease Registry (ATSDR)—which is a federal public health agency that is a part of the U.S. Department of Health—the toxic elements found in their hair samples correlate with the diseases from which they are suffering.[29]
Thus, in brief, given the record before us on appeal and considering the applicable standard for Rule 12(b)(1) motions, we must accept as true the following factual allegations:
(1) The Navy has been conducting operations in and around Vieques since the early 1940s.
(2) These operations have caused substantial toxic substances, among them arsenic, boron, cyanide, hexavalent chromium, and thirteen other toxic substances (e.g., benzene and toluene), to be introduced into the Vieques environment, including into the air, soil, sea, ground water, vegetation, sea grasses, fauna, and fish in and around the island, both within the AFWTF and the civilian sectors.
(3) Since at least 1979, the Navy has been aware and on notice of the toxic impact of its activities in the AFWTF. Nevertheless, it has not only continued to pollute the AFWTF with the aforementioned substances, it has allowed this pollution to impact the civilian sectors of Vie-ques, including Plaintiffs. Additionally, it has aggravated the consequences of this situation by inviting and allowing commercial fishing and cattle grazing to take place within the AFWTF; by failing to warn Plaintiffs of the dangerous conditions to which they were being subjected by their entry into the AFWTF; and by failing to warn the Plaintiffs that their consumption of plants, animals, and fish that had been exposed to and contaminated by the toxic substances found in the AFWTF could cause serious injury or death to them.
(4) Since at least 1979, the Navy has been required to comply with NEPA (for engaging in actions that “significantly affect[] the quality of the human environment,” 42 U.S.C. § 4332(C)) and to seek and comply with an NPDES permit. Notwithstanding this obligation, since at least 1985 the Navy’s toxic discharges into the Vieques waters exceeded the allowable limits under the Permit, which violations were duly notified to the Navy by the EPA, with no corrective action being taken.
(5) Plaintiffs are suffering from diseases and injuries that were caused by the toxic substances that the Navy placed in the *113 environment and to which Plaintiffs have been directly and indirectly exposed.
Bearing in mind that “[i]n ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), the district court must construe the complaint liberally,” Aversa, 99 F.3d at 1209-10, there is no question but that these facts, if proven at trial, present a plausible cause of action under Article 1802 of the Puerto Rico Civil Code. Under Puerto Rico law, the failure of a property owner to warn an invitee of the existence of known dangerous conditions on his or her property exposes the property owner to liability for damages.[30] Even outside the realm of premises liability,[31] the factual allegations at issue in this case sufficiently articulate a claim of negligence as “failure to exercise due diligence to avoid foreseeable risks,” Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc., 124 F.3d 47, 50 (1st Cir.1997), which is plausibly the proximate cause of the injuries inflicted upon the plaintiffs.
III.
The Navy attempts to shield itself from liability by invoking the “discretionary function” exception. Although the government did not raise this defense in its answer to Plaintiffs’ administrative claim, presenting it for the first time in their motion to dismiss, the government is allowed to engage in such sandbagging tactics. See Irving v. United States, 162 F.3d 154, 160 (1st Cir.1998) (en banc).
The majority concludes that the Navy’s failure to warn Plaintiffs of the dangers previously described is not actionable because the decision regarding whether to warn was an exercise of discretion, and thus the discretionary function exception applies. I disagree. In considering the application of the discretionary function exception, the Court must first identify the conduct at issue. Montijo-Reyes v. United States, 436 F.3d 19, 24 (1st Cir.2006). The Court then “asks two interrelated questions: (1) Is the conduct itself discretionary? (2) If so, does the exercise of discretion involve (or is it susceptible to) policy-related judgments?” Id. (quoting Muniz-Rivera, 326 F.3d at 15) (internal quotation marks omitted).
A.
As to the first question, “[t]he requirement of judgment or choice is not satisfied if a ‘federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,’ because ‘the employee has no rightful option but to adhere to the directive.’ ” United States v. Gaubert, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quoting Berkovitz, *114 486 U.S. at 536, 108 S.Ct. 1954). “[I]f the employee’s conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the ... exception to protect.” Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954.
In this case, Plaintiffs allege the existence of mandatory rules, specific in nature, which required Navy compliance therewith, but which were not honored by the Navy and were the cause of Plaintiffs’ injuries. To begin with, at least since Romero-Barcelo in 1979, the Navy was aware that it was covered by the mandatory provisions of NEPA, that it was polluting the Vieques environment, and that it was required under the CWA to seek the NPDES permit and comply with its provisions. It bears noting that the rulings and orders in Romero-Barcelo regarding the Navy’s violations and compliance requirements were affirmed by both this Court and the Supreme Court. See Romero-Barcelo, 643 F.2d at 861-62 (First Circuit decision affirming district court’s finding that the Navy had “utterly disregarded” statutory mandates and remanding for issuance of an order that the Navy “take all necessary steps to insure that no ordnance is discharged into the coastal waters of Vieques until such time as it obtains a NPDES permit”); see also Weinberger, 456 U.S. at 307-11, 320, 102 S.Ct. 1798 (affirming the district court’s findings and reversing the Court of Appeals on other grounds). Plaintiffs specifically alleged in their complaint, and proffered evidence to the effect, that the Navy nevertheless continued to exceed mandatory mínimums under the CWA and the Puerto Rico EQB’s water quality standards, ignoring admonitions by the EPA, as a result of which Plaintiffs-invitees were injured and Plaintiffs-civilian bystanders were collaterally damaged. Thus, the damage claimed here is, in essence, allegedly caused by the Navy’s affirmative actions of inviting civilians onto a known danger within the government’s control, and the Navy’s engagement in violations of mandatory regulations and policies. This is an important distinction between the present situation and the Abreu case, in which no claim was made that the plaintiffs’ injuries were caused by the Navy’s invitations or failure to warn.
Furthermore, this is a suit under the FTCA, which only has one exception that is arguably relevant to the case before us, the discretionary function exception of 28 U.S.C. § 2680(a). The issue in this case is not whether the CWA or NEPA created a private cause of action for damages. Cf. Middlesex County Sewerage Authority v. Sea Clammers, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (addressing the lack of an implied cause of action for compensatory damages under 33 U.S.C. § 1365(a), the citizen-suit provision of the CWA). Indeed, the CWA, NEPA, and other regulations are of relevance only in determining whether the Navy comes within the discretionary function exception. This Court is bound by the higher authority of Gaubert and Berkovitz, which establish the inapplicability of the discretionary function exception when there are mandatory legal requirements, such as exist in the present case by reason of court rulings (RomeroBarcelo ), federal statutes {e.g., NEPA and CWA), and specific permit standards {e.g., the NPDES permit), all of which the Navy has allegedly disregarded to the claimed prejudice of Plaintiffs.
The CWA provides that “[e]ach department ... of the executive ... engaged in any activity resulting ... in the discharge or runoff of pollutants ... shall be subject to, and comply with, all Federal, State, interstate, and local requirements ... respecting the control and abatement of water pollution in the same manner and to the same extent as any nongovernmental *115 entity....” 33 U.S.C. § 1323(a). It bears emphasizing that the Navy could have requested a presidential exemption from compliance with this provision for its military exercises on Vieques, yet it never did so. See id. (“The President may exempt any effluent source of any department, agency, or instrumentality in the executive branch from compliance with any such a requirement if he determines it to be in the paramount interest of the United States to do so ...”). Instead, the Navy had to be ordered to procure an NPDES permit, which it nevertheless subsequently violated. In my view, the Navy’s failure to make use of this statutory exemption— preferring instead to flaunt the statute’s mandates, thereby allegedly causing harm to the citizenry of Vieques—militates against the creation of a special category for the Navy as a regulated party to subvert the FTCA’s general waiver of sovereign immunity. See infra at 101-02. More importantly, the fact that Congress created a specific mechanism, ie. Presidential exception, for the Navy to seek inapplicability of this environmental statute to its operations where appropriate, clearly indicates that, sans presidential exception, the Navy was required to comply with the same, as held in Romero-Barcelo. See also 40 C.F.R. § 1506.11 (providing, in the context of NEPA, that “[w]here emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of [NEPA regulations], the Federal agency taking the action should consult with the [Council on Environmental Quality, within the Executive Office of the President] about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.”).
Thus, the majority’s creation of this lacuna is totally unsupported by law. If proven, Plaintiffs’ contentions would make the government liable for the resulting tort claims “in the same manner and to the same extent as a private individual under like circumstances.” 28 U.S.C. § 2674.
It is worth noting that Plaintiffs make additional allegations in their complaint to support their theory that the Navy is liable under the FTCA for their injuries from past contamination and that the discretionary function exception does not shield it from liability under Gaubert. As the majority recognizes, see Maj. Op. at 90-91, Plaintiffs allege that the Navy violated permits concerning depleted uranium, relying on a letter from the Navy to the Nuclear Regulatory Commission (NRC)[32] that describes an event that took place in 1999 in which two aircraft fired at least 263 depleted uranium 25 mm rounds on Vieques. The letter indicates that “[t]he firing of [depleted uranium] ammunition on Navy or Marine Corps firing ranges is a violation of the Navy’s Master Material License No. 45-23645-01NA, and specifically, the Naval Radioactive Material Permit No. 13-00164-L1NP pertaining to depleted uranium.” Plaintiffs further allege that as of 2001, only 116 of the 263 rounds had been found and removed. They also allege that studies have found “significantly higher than background radiation levels about a mile from where the [depleted uranium] was reportedly fired,” and that this suggests uranium has been used “on *116 several other occasions on Vieques,” in violation of the referenced permits.
The majority finds that these allegations do not sustain Plaintiffs’ FTCA claim because they are “insufficiently supported,” and that “[Plaintiffs] have failed to adequately allege that the challenged conduct was non-discretionary, assuming Gaubert would apply here.” Maj. Op. at 97. I believe that in reaching this conclusion the majority fails to properly credit Plaintiffs’ averments, applying a higher pleading standard than is warranted at the motion to dismiss stage. See Aversa, 99 F.3d at 1209-10. What is more, the cases relied upon by the majority to conclude that Plaintiffs “have identified only vague, permissive, or unidentified requirements for government conduct,” Maj. Op. at 97, do not involve the alleged violation of permit requirements, as in the case at hand. See Muniz-Rivera, 326 F.3d at 14-17 (discretionary function exception barred claims arising from alleged negligent supervision of construction of homes and failure to erect levees for housing development per applicable regulations); Irving, 162 F.3d at 163-64 (same, in relation to claim of negligently performed workplace inspections). Plaintiffs have alleged the violation of specific permits regarding the firing of depleted uranium bullets, and specifically cite to a letter in which the Navy admits as much. These allegations, read in conjunction with the rest of the complaint, bolster the FTCA claim and serve as an independent basis for liability.
B.
As to the second inquiry in the discretionary function analysis, the majority holds that the Navy’s failure to warn Plaintiffs of the dangers previously described was a decision subject to “policy analysis,” and thus concludes that it was an exercise of discretion that exempts the government from liability. See Maj. Op. at 99-100; see also Gaubert, 499 U.S. at 323, 111 S.Ct. 1267 (“When properly construed, the exception protects only governmental actions and decisions based on considerations of public policy.”) (internal quotation marks and citation omitted). However, it is not sufficient to simply assert that some policy analysis took place; rather, the government must show that its decision could be the result of a reasonable policy analysis. See, e.g., Shansky v. United States, 164 F.3d 688, 692 (1st Cir.1999) (conduct is susceptible to policy analysis if “some plausible policy justification could have undergirded the challenged conduct” (emphasis added)); see also Berkovitz, 486 U.S. at 539, 108 S.Ct. 1954 (“The discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment.” (emphasis added)). I find it hard to see how there is any reasonable or permissible policy analysis that could justify the Navy’s failure to warn Plaintiffs of the known dangers created by the Navy’s violation of the laws and regulations applicable to its conduct.
In our constitutional system of government the military is subordinate to the civil authority. See Reid v. Covert, 354 U.S. 1, 23, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). Thus, whatever discretion the military has, it is not without bounds. When necessary, the courts have stepped in to affirm that there are limits on what can be done in the name of national security. See, e.g., Bowmediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (holding that enemy combatants detained at the U.S. Naval Station at Guantanamo Bay, Cuba have the privilege of habeas corpus despite argument that allowing access to courts would interfere with military operations); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 589, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (rejecting Presi *117 dent’s claim of “inherent power” to use the military to seize property within the United States, despite Government’s argument that refusal would “endanger the well-being and safety of the Nation”); Ex Parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866) (holding unconstitutional the exercise of military jurisdiction to try and punish a civilian citizen even during an insurrection (the Civil War), where Article III courts were open and functional). I cannot countenance a legal concept or theory that would give the military qua military carte blanche license to harm U.S. citizens through its negligent actions without any consequence.
Contrary to the majority in this case, I find that the situation presented here is similar to Andrulonis v. United States, 952 F.2d 652 (2d Cir.1991). In Andrulonis, a government researcher contracted rabies after his supervisor failed to warn him about dangerous conditions in the laboratory where he worked. Andrulonis, 952 F.2d at 653. The Second Circuit held that no policy considerations could explain a failure to warn about such “obvious, easily-correctable dangers in experiments.” Id. at 655.
The majority distinguishes Andrulonis by arguing that “[ujnlike the obvious, easily correctable danger at issue in Andrulonis, the plaintiffs do not challenge an obvious health hazard or an easily-eorrectable danger from environmental effects.” See Maj. Op. at 100. However, it seems clear that the Plaintiffs are in fact alleging such a danger. The environmental contamination was obvious—it is undisputed that the Navy knew about it at least as far back as when Romero-Barceld was decided, see supra note 14—and the danger to civilians could have been avoided simply by warning them about the risks.
The majority points out that “the Navy ... must weigh competing interests between ‘secrecy and safety, national security and public health.’” Maj. Op. at 100 (quoting Abreu, 468 F.3d at 26). However, while I recognize that courts must accord great deference to the military in decisions relating to national security, I cannot accept that courts must be so deferential as to effectively give the military carte blanche to put U.S. citizens in danger when the facts alleged show a clear and simple alternative, warning them of known dangers created by it. Plaintiffs here are not claiming that the Navy should have revealed classified information about tactics or weapons used at Vieques, or that they should have ceased the military activities. They are simply claiming that the Navy should have warned them as to the potential danger of entering onto, and being exposed to, contaminated property. See Pacheco v. United States, 220 F.3d 1126, 1131 (9th Cir.2000) (finding potential liability under the FTCA for failure to warn invitees to a beach of known dangers); United States v. White, 211 F.2d 79, 82 (9th Cir.1954) (failure of government as land owner to warn business invitee of danger from unexploded projectiles “could not rationally be deemed the exercise of a discretionary function”); Henderson v. United States, 784 F.2d 942, 943 n. 2 (9th Cir.1986) (safety decisions at government facility are operational in nature, and therefore not within the discretionary function exception).[33] Military decision *118 making may be subject to some deference, but that cannot mean that a military department should remain immune to the nefarious consequences of its decisions upon innocent civilians.
C.
Finally, there is nothing in the language or history of the FTCA that warrants our Court carving out an exclusion from the liability imposed by Congress for what the majority dubs “regulated parties” (e.g. the military), under the guise of the discretionary function exception to the FTCA. Cf. Abreu, 468 F.3d at 28. The language of 28 U.S.C. § 2680(a) is unambiguous in this respect. The FTCA does not apply to “any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty....” 28 U.S.C. § 2680(a). Interpreting what constitutes “discretionary” conduct is far different from creating by judicial fíat a whole class of governmental entities who are thus given free reign to cause egregious harm to the citizenry.
In Abreu, this Court observed that prior Supreme Court cases invoking the rule of Gaubert had involved suits against the United States based on the activities of federal regulators, as opposed to regulated parties, and that therefore the Gaubert rule may be “inapplicable to mandatory directives aimed at a regulated party.” See Abreu, 468 F.3d at 27. I must emphasize that these observations in Abreu constitute dicta—“observations relevant, but not essential, to the determination of the legal questions then before the court”— *119 and are thus not binding on this panel. Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 459 (1st Cir. 1992). The Abreu decision recognized as much. See Abreu, 468 F.3d at 28 (“[W]e need not decide the difficult question whether the rule of Gaubert is inapplicable to regulated parties for we conclude that the Gaubert rule is inapplicable here for other reasons”).
I suggest it would be more appropriate if the majority adhered to the Supreme Court’s admonitions to the effect that FTCA exceptions are not to be construed in an “unduly generous” fashion. See Kosak v. United States, 465 U.S. 848, 853 n. 9, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984) (“[T]he proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify those circumstances which are within the words and reason of the exception—no less and no more.” (internal quotation marks and citation omitted)); Block v. Neal, 460 U.S. 289, 298, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983) (admonishing against interpretation of exemption to the FTCA waiver of sovereign immunity that would “add to its rigor”). As the Supreme Court clarified in Dolan v. United States, “the general rule that a waiver of the Government’s sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign .... [i]s unhelpful in the FTCA context, where unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute, which waives the Government’s immunity from suit in sweeping language.” 546 U.S. 481, 491-92, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006) (internal quotation marks and citations omitted).
Furthermore, as previously stated, supra at 114-15, the Navy could have, but did not seek a Presidential exemption. I am hard put to understand why it is entitled to the judicial exemption created from whole cloth by the majority.
Nowhere does the medieval concept of “the King can do no wrong” underlying the doctrine of sovereign immunity, see Donahue v. United States, 660 F.3d 523, 526 (1st Cir.2011) (Torruella, J., concerning denial of en banc review), sound more hollow and abusive than when an imperial power applies it to a group of helpless subjects. This cannot be a proper role for the United States of America. Under the circumstances alleged in this case I posit that the application of this anachronistic and judicially invented theory, id., violates the due process clause of the Constitution. See U.S. Const. amend. V; see also Donahue, 660 F.3d at 526-27 (citing Edwin M. Bouchard, Governmental Responsibility in Tort (pt. VI), 36 Yale L.J. 1, 17-41 (1926); Erwin Chemerinsky, Against Sovereign Immunity, 53 Stan. L. Rev. 1201 (2001)).
IV.
Lastly, I take issue with the majority’s reference to the ATSDR’s investigation dealing with the Navy’s contamination of the environment in Vieques. See Maj. Op. at 103 n.12. At this procedural stage this investigation is irrelevant to the present case. See Ocasio-Hemández, 640 F.3d at 13-14 (the merits of the issues underlying a complaint are irrelevant at the motion to dismiss stage); Hosp. Bella Vista, 254 F.3d at 363 (court must accept as true all well-pleaded factual allegations without prejudging their weight or plausibility). Furthermore, although I agree with the majority calling the attention of Congress to the plight of the citizens of Vieques, an action which I join and applaud, this referral cannot be considered as an appropriate alternative or substitute to the exercise by these citizens of their right to present their legitimate claims, and to have them resolved, by a Court of the United States.
*120 V.
In this latest chapter to the ongoing Culebra/Vieques saga, this Court blocks Plaintiffs’ access to the courts of the United States, depriving U.S. citizens who live in Vieques of the only effective remaining forum in which to seek redress for their alleged wrongs. Access to the political forum available to most other citizens of the United States has already been blocked by this same Court. See Igartúa v. United States, 654 F.3d 99, 101-02 (1st Cir.2011) (Torruella, J., concerning the denial of en banc consideration); see also Balzac v. Porto Rico, 258 U.S. 298, 308-09, 42 S.Ct. 343, 66 L.Ed. 627 (1922) (describing the limited “civil, social, and political” rights that attach to United States citizens residing in Puerto Rico). I for one, protest this intolerable and undemocratic situation in the strongest of terms.
I dissent.

. The population of Culebra consists of about 1,000 permanent residents while that of Vieques is about 9,300 persons.

. See Romero-Barcelo v. Brown, 478 F.Supp. 646, 659-60 (D.P.R.1979) (as to Vieques, describing the Navy's properly as "physically divided into two sections [that are] bisected by the civilian area of [the island]”). In the case of Culebra, by presidential proclamation in 1941, the entire air space and waters surrounding Culebra, including the civilian municipality, were interdicted by the U.S. Navy. See Feliciano v. United States, 297 F.Supp. 1356 (D.P.R.1969), aff’d, 422 F.2d 943 (1st Cir.1970); Exec. Order No. 8684, 6 Fed. Reg. 1016 (Feb. 14, 1941) (designating the "Culebra Island Naval Defensive Sea Area”).

. See Romero-Barcelo, 478 F.Supp. at 659-60 (describing use of beaches by Marines for amphibious landings).

. Exec. Order No. 11,886, 40 Fed. Reg. 49,-071 (Oct. 21, 1975) (abolishing the "Culebra Island Naval Defensive Sea Area” established by Executive Order No. 8684, and noting that the "Culebra Island Naval Airspace Reservation” had been since revoked by the Federal Aviation Administration at the Navy’s request). See Abstract, N.Y. Times, Oct. 20, 1975, available at 1975 WLNR 56658 (reporting on departure of Navy from Culebra).

. See Romero-Barcelo, 478 F.Supp. at 656 n. 24 (noting evidence of increase in the intensity of operations in Vieques between 1975 and 1979, reflected in the amount of artillery used, naval gunfire realized, and air-to-ground ordnance delivered).

. See generally Kathleen Margareta Ryder, Vieques’ Struggle for Freedom: Environmental Litigation, Civil Disobedience, and Political Marketing Proves Successful, 12 Penn St. Envtl. L. Rev. 419, 423-35, 437-43 (2004) (describing unsuccessful litigation by the Commonwealth government, Puerto Rican environmental organizations, and private citizens to enjoin the activities of the Navy in Vieques; describing rise of civilian protest movement).

. See Resolution Regarding Use of Range Facilities in Vieques, Puerto Rico (Referendum), 65 Fed. Reg. 5729 (Jan. 31, 2000) (restricting use of Vieques training range to 90 days per year pending a referendum by the citizens of Vieques on the future of Navy exercises on the island, giving citizens a choice between allowing naval training indefinitely in return for $50 million for infrastructure development or requiring the Navy to leave by May of 2003); Press Release, Dep't of Defense, Department of Navy Transfers Vieques Property (Apr. 30, 2003), available at http://www.defense.gov/releases/release.aspx? releaseid=3798 (last visited Nov. 22, 2011) (announcing Navy’s transfer of all real property on the eastern end of Vieques to the administrative jurisdiction of the Department of Interior, requiring development of the land for use as a wildlife refuge and that Navy retain responsibility for environmental cleanup); Iván Román, Navy Ships Out of Island, Vieques Residents Cheer End of Drills, Face Health Woes, Chi. Trib., May 1, 2003, available at 2003 WLNR 15336471.

. At the time, Roosevelt Roads was one of the largest U.S. naval bases in the world.

. Department of Defense Appropriations Act of 2004, § 8132(a), 117 Stat. 1054 (2003) (mandating closure of Naval Station Roosevelt Roads within six months of enactment); see Big U.S. Navy Station in Puerto Rico Closes, Seattle Times, April 1, 2004, available at 2004 WLNR 1778245.

. See, e.g., Abreu v. United States, 468 F.3d 20 (1st Cir.2006) (appeal from dismissal of FTCA action against the Navy for violation of RCRA); United States v. Pérez-González, 445 F.3d 39 (1st Cir.2006) (appeal from conviction for destruction of government property in the U.S. Naval Training Facility in Vieques); United States v. Zenón-Encamación, 387 F.3d 60 (1st Cir.2004) (affirming conviction for trespass on military base in Vieques); United States v. Ventura-Melendez, 321 F.3d 230 (1st Cir.2003) (same); United States v. Figueroa-Arenas, 292 F.3d 276 (1st Cir.2002) (appeal from $500 fine imposed on lawyer for alleged misconduct while defending a client accused of trespassing in Vieques military reservation); United States v. Mulero-Joubert, 289 F.3d 168 (1st Cir.2002) (reversing conviction for trespass on military base in Vieques); United States v. Zenon-Rodríguez, 289 F.3d 28 (1st Cir.2002) (affirming conviction for trespass on military base in Vieques); United States v. Ayala, 289 F.3d 16 (1st Cir.2002) (same); United States v. Guzman, 282 F.3d 56 (1st Cir.2002) (same); United States v. de Jesus, 277 F.3d 609 (1st Cir.2002) (same); United States v. Burgos-Andujar, 275 F.3d 23 (1st Cir.2001) (same); United States v. Silva-Rosa, 275 F.3d 18 (1st Cir.2001) (same); United States v. Ventura-Meléndez, 275 F.3d 9 (1st Cir.2001) (same); United States v. Sued-Jiménez, 275 F.3d 1 (1st Cir.2001)(same); Water Keeper Alliance v. United States Dep’t of Def., 271 F.3d 21 (1st Cir.2001) (appeal from denial of request for preliminary injunction to stay Navy’s military exercises in Vieques); United States v. Maxwell, 254 F.3d 21 (1st Cir.2001) (affirming conviction for trespass on military base in Vieques); United States v. Sharpton, 252 F.3d 536 (1st Cir.2001) (same); United States v. Saade, 800 F.2d 269 (1st Cir.1986) (appeal from determination that 33 C.F.R. § 204.234 did not unreasonably interfere with or restrict the food fishing industry, where defendants had been convicted for entering restricted waters during naval gunnery practice); United States v. Puerto Rico, 721 F.2d 832 (1st Cir,1983) (affirming district court's order denying the Commonwealth's motion to dismiss the Navy's suit challenging a determination by the Commonwealth's Environmental Quality Board that the Navy was violating water quality standards); United States v. Zenon, 711 F.2d 476 (1st Cir.1983) (denial of appeal from issuance of permanent injunction forbidding unlawful entrance in Vieques restricted areas); Romero Barcelo v. Brown, 655 F.2d 458 (1st Cir.1981) (appeal arising from post-judgment proceedings); United States v. Saade, 652 F.2d 1126 (1st Cir.1981) (affirming in part conviction for trespass on military base in Vieques and remanding to determine *106 whether danger zone regulation unreasonably interfered with food-fishing industry); United States v. Parrilla Bonilla, 648 F.2d 1373 (1st Cir.1981) (reversing conviction for trespass on military base in Vieques); Romero-Barcelo, 643 F.2d 835 (1st Cir.1981) (reversing district court's denial of injunction to stop military operations in Vieques that were found to be in violation of NEPA); United States v. Parrilla Bonilla, 626 F.2d 177 (1st Cir. 1980) (disallowing disqualification of sentencing judge in case involving conviction for trespassing on Vieques military property); Feliciano v. United States, 422 F.2d 943 (1st Cir. 1970) (enforcement of Presidential order creating “Culebra Island Naval Defensive Sea Area” against civilian population of Culebra not a taking of plaintiff's property or violation of right to travel or due process).

. The complaint was originally filed in the District Court for the District of Columbia. It was transferred to the District of Puerto Rico on March 16, 2009.

. According to the district court and the majority of this panel, our decision in Abreu, read in conjunction with Middlesex County Sewerage Authority v. National Sea Clammers Ass’n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), requires the conclusion that an action for damages in this case is foreclosed under the FTCA if it is based on the violation of a mandatory permitting requirement under the CWA. Maj. Op. at 94-96. See Abreu, 468 F.3d at 32 (finding that "allowing the recovery of damages in a FTCA suit, based on the violation of a mandatory permitting requirement” under a federal statute that precludes compensatory damages “would undermine the intent of Congress”); see also Sea Clammers, 453 U.S. at 18, 101 S.Ct. 2615 (holding that the structure and legislative history of the CWA indicated there is no implied cause of action for compensatory damages under the *108 citizen-suit provision of the Act). However, I believe the majority’s conclusion does not account for the significant factual differences between this case and Abreu, noted infra, which places this case outside the confines of such a holding. Among those differences is the fact that the complaint in this case contains various alternative theories of liability, and was not "specifically designed to achieve an end run around” congressional limitations to actions for damages under the CWA. Abreu, 468 F.3d at 32 (noting complaint originally brought for Navy's RCRA violations, which claims were dismissed, and that plaintiffs continued to base their state-law tort claims on the RCRA standard of liability, triggering court's concern that the FTCA claim at issue had been “specifically designed” to undermine congressional limitations on RCRA private damages actions). It should also be noted that the FTCA claim in Sea Clammers was dismissed at the district court level because plaintiffs had failed to file administrative claims before proceeding to the courts, and thus the FTCA claims were not part of the Sea Clammers rationale. Sea Clammers, 453 U.S. at 8, 101 S.Ct. 2615.

. Plaintiffs allege in the complaint, and it is uncontested, that they exhausted the administrative claims process; that they received on March 12, 2007 the Navy's final denial letter; and that thereafter they filed their complaint within the six-month time period prescribed by 28 U.S.C. § 2675(a).

. Romero-Barcelo v. Brown was the result of a trial lasting three months in which sixty-three witnesses testified, hundreds of exhibits became part of the record, and two visual inspections took place, including an underwater viewing of the numerous unexploded ordnance present in the waters surrounding Vie-ques. I—as the district judge that heard the evidence in that case—concluded that the Navy had violated several federal statutes, including the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, et seq., and the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. §§ 1251-1376, because it engaged in a "major federal action significantly affecting the quality of the human environment,” 42 U.S.C. § 4332(2)(C), without having prepared and filed an environmental impact statement (EIS), and because it had discharged ordnance into the waters of Vie-ques without first securing a NPDES permit, as required by 33 U.S.C. § 1311(a). RomeroBarcelo, 478 F.Supp. at 703-05, 663-67. Although I exercised my discretion and did not issue an injunction prohibiting the continuation of military activities in Vieques as the plaintiffs in that case requested, I ordered the Navy to file an EIS and to otherwise comply with the FWPCA by seeking an NPDES permit "with all deliberate speed.” Romero-Barcelo, 478 F.Supp. at 708. These orders were approved by the Supreme Court in Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

. See Romero-Barcelo, 478 F.Supp. at 666 (indicating that maximum concentrations included (in mg/1 measurement): arsenic, 0.15; barium, 1.0; cadmium, 0.005; chromium, 0.05 (hexavalent) and 0.30 (trivalent); copper, 0.05; iron, 0.200; lead, 0.015; and mercury, 0.001; among others).

. See A. Massol-Deyá, et al., Trace Elements Analysis in Forage Samples from a U.S. Navy Bombing Range (Vieques, Puerto Rico), 2 Int’l J. Envtl. Res. & Pub. Health 263, 264 (2005).

. There are a total of 7,125 Plaintiffs in this case, all with specific allegations that are similar in nature to those alleged by Plaintiffs Rivera-Sánchez and Colon-Ayala. These range from diagnoses of asthma, other respiratory illnesses, and high blood pressure, to cancer, kidney problems, and liver disease. All of Plaintiffs' hair samples present toxic concentrations of heavy metals which are, in each case, indicated to correlate to the diagnosed diseases. These allegations can be found in ¶¶ 36-7151 of the complaint.

. See Rivera Santiago v. United States, No. 08-1266(RLA), 2009 WL 702235, at *5 (D.P.R. Mar. 11, 2009) (discussing Puerto Rico precedent regarding owner’s liability as requiring (1) "the existence of a dangerous condition which [(2)] proximately caused the injuries alleged and that [(3)] the defendant had either actual or constructive knowledge of said dangerous condition.” (citations omitted)); see also Mas v. United States, 984 F.2d 527, 530 (1st Cir.1993) (discussing Puerto Rico jurisprudence establishing that property owners are responsible for the safekeeping of business invitees and are liable for injuries resulting from dangerous conditions of which the owner has either actual or constructive knowledge).

. See Rivera Pérez v. Cruz Corchado, 19 P.R.Offic.Trans. 10, 119 P.R.Dec. 8 (1987) (suggesting that the difference between an invitee, a franchisee, a licensee, or a trespasser is not relevant to the determination, under Puerto Rico law, of whether an owner is liable for damages sustained by others on his or her property; tort liability in civil law jurisdictions turns simply on whether the owner negligently or knowingly caused the plaintiff a foreseeable harm).

. The majority incorrectly states that the letter was sent by the NRC to the Navy, see Maj. Op. at 90-91, but a review of the referenced document reveals that it was sent by Cornmander G.A. Huggins, Executive Secretary of the Naval Radiation Safety Committee to the NRC for Region II.

. In this regard, I further disagree with the majority that the present case is similar to Loughlin v. United States, 393 F.3d 155 (D.C.Cir.2004), or In re Consolidated U.S. Atmospheric Testing Litigation, 820 F.2d 982 (9th Cir.1987). See Maj. Op. at 101.
The Loughlin case involved chemical munitions that the Army had buried at a site near Washington, D.C. during and immediately following World War I. 393 F.3d at 159-60. Roughly 70' years later, the munitions were discovered and the site was found to be con *118 taminated. Id. at 160-61. Plaintiffs in that case, who were residents and landowners in the area, sued on a failure-to-warn theory. They first argued that the Army's initial decision to bury the munitions without warning the public was not susceptible to policy considerations. Id. at 164. The court rejected tills argument, noting that this decision— made some 70 years earlier, in the immediate aftermath of a major war—"required balancing 'competing concerns of secrecy and safety, national security and public health.' ” Id. at 164 (quoting Loughlin v. United States, 286 F.Supp.2d 1, 23 (D.D.C.2003)). The plaintiffs also argued that the government should have warned them about the results of certain initial tests carried out at the site. Id. at 164-65. However, the court noted that the tests in question had not been conclusive, and that "the agency would have had to weigh several factors, including the reliability of the test ... [and] the possibility of unnecessarily alarming [area] residents should the danger have ultimately proved unfounded...." Id. at 165.
Atmospheric Testing involved claims arising out of the atmospheric testing of nuclear weapons between the end of World War II and 1963. 820 F.2d at 984. The specific tests at issue were the very first atmospheric tests ever conducted, and were conducted in remote areas, including the Nevada desert and islands in the South Pacific. Id. at 985-86. The plaintiffs, who were soldiers and civilian contractors who had participated in the testing, sued under a failure-to-warn theory based on the government’s failure to warn them about the dangers of radiation exposure at the time the tests were conducted. Id. at 996. The court noted that there was only "fragmentary knowledge” of the risks at the time; further, a "specific goal” of the tests was to measure the psychological reactions of troops to the use of nuclear weapons, and as such "the government needed complete control over information supplied to the troops.” Id. at 997 & n. 17. Under those circumstances, the court found that the discretionary function exception applied. Id. at 997-98.
The factual and historical context of these cases is entirely different from the context at issue here. This is not a case involving unconfirmed contamination from munitions buried during wartime, decades earlier. Nor is it a case involving the then-unknown effects of nuclear weapons testing conducted at the start of the Cold War, on soldiers and civilian defense contractors who were themselves involved in the experiments. The plaintiffs here are civilians who had no connection to the Navy’s operations, and they have alleged that the Navy failed to warn them about ongoing, known environmental hazards in an area close to civilian population centers.